**UNITED STATES, Appellee,**

v.

**Leonard E. SPAULDING, Jr., Private First Class, U.S. Army, Appellant.**

No. 59,807.
CM 8700249.

U.S. Court of Military Appeals.

Sept. 27, 1989.

For Appellant: *Captain William J. Kilgallin* (argued); *Colonel John T. Edwards, Lieutenant Colonel Joel D. Miller, Major*

*Marion E. Winter* (on brief); *Lieutenant Colonel Charles A. Zimmerman.*

For Appellee: *Captain Joseph P. Falcone* (argued); *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Major Kathryn F. Forrester* (on brief); *Captain Mark E. Frye.*

### Opinion of the Court

EVERETT, Chief Judge:

A general court-martial composed of officer and enlisted members tried Private First Class Spaulding at Karlsruhe, Federal Republic of Germany, on a Charge with four specifications alleging distribution of hashish, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. Contrary to his pleas, he was found guilty as charged and sentenced to a bad-conduct discharge, confinement and forfeiture of $658.20 pay per month for 3 years, and reduction to Private E–1. Except for slightly reducing the forfeitures, the convening authority approved the sentence; and the Court of Military Review affirmed the findings and sentence in an unpublished opinion. We granted review on this issue:

> WHETHER THE MILITARY JUDGE ERRED IN ADMITTING TESTIMONY AND EVIDENCE DERIVED FROM A STATEMENT TAKEN IN VIOLATION OF APPELLANT'S ARTICLE 31 [,UCMJ, 10 USC § 831] RIGHTS.

### I

Prior to entering pleas, the defense moved to suppress a pretrial statement by appellant and the testimony of Private Charles Hylton, Jr. The first government witness on this motion was Military Police Investigator Thomas Woodward, who testified that he had first met Spaulding "during a Drug Suppression Team operation on 7 August 1986."

At that time Spaulding and "two other individuals were working on an automobile" in front of an apartment complex at 25 Moningerstrasse in Karlsruhe; and Woodward had no information relating Spaulding to drug activity that had taken place in the apartment where he was living. Woodward and his supervisor, Special Agent Meek of the Criminal Investigation Command (CID), accompanied German police up to the apartment. The German police were there because "the apartment was listed in the name of a Mrs. Spaulding, Marion Spaulding," who was a German national. The military police were there because an American soldier named Ross had been involved in distributing hashish there to a female undercover agent, Investigator Catherine Curio.

In the apartment kitchen, Woodward talked to appellant, who had been "concerned of the welfare of his wife," Marion Spaulding. Woodward "told him that I didn't know what the German police were going to do, but that they were colleagues of ours, and that I could speak with them and find out what they had in mind to do." According to Woodward, Spaulding "volunteered ... that he was aware of what she was doing"; but "he stayed out of this business." Woodward, who "believed that ... [appellant] had some knowledge of drug related activity," told Spaulding that he would "speak with the German police on his behalf regarding his wife, and asked him would he be interested in volunteering any information that he might have regarding drug-related activity." Woodward wanted to learn what Spaulding knew so the CID could "look into it"; but he did not ask appellant about the transaction involving Ross.

The search by the German police ended about 9:30 p.m.; and Woodward asked Spaulding "to come down to the CID office" in order "[t]o further develop this information that I believed he may have." Spaulding "was not in custody at the time"; and Woodward's purpose was "to develop him as an informant ... [f]or the Drug Suppression Team."

They went down to the Military Police Station, where Woodward interviewed appellant without advising him of any rights. During the interview, Spaulding incriminated himself by mentioning that he had ex-

changed an automobile for some hashish; and at that point Woodward terminated the interview and went to see Special Agent Meek for advice. He returned, advised Spaulding of his rights, obtained a waiver of rights at 10:00 p.m. and a signed statement at 12:30 a.m. the next morning, this statement being a subject of the motion to suppress.

The defense cross-examined Woodward about inconsistent testimony that he had given during the Article 32, UCMJ, 10 USC § 832, investigation. For example, at that time, he had testified that Spaulding had been "apprehended outside of his home while he was working on his car." Also, he had not mentioned that, when Spaulding "started to make a confession," he had "stopped the interview and went in and consulted with Mr. Meeks." However, Woodward insisted that he had initially only been asking "Spaulding for information he may have had on other drug-related activities; not his own specific case." In explaining to "Spaulding his rights at the CID office," Woodward did not "give any kind of a cleansing statement to him, which would explain to him that his previous information he had given in the kitchen would not be used against him."

According to Woodward, appellant said that he and Hylton had exchanged a car for hashish; and this admission prompted termination of the initial interview. This "was something like fifty grams of hash in exchange for a BMW, or something." Before Spaulding had come to the CID office on the evening of August 7, Woodward had promised to "speak to his commander in his behalf if he wanted" and also to "talk to the Polizei on behalf of his wife."

The second government witness on the motion to suppress was Special Agent Michael Meek, who had first been in contact with appellant at about 8:30 p.m. on August 7, 1986. This contact resulted from a drug investigation pertaining to a soldier named Ross, who, on August 5 and 7, had sold hashish to Investigator Curio. Because of information supplied by Curio, it

was suspected that a German national was the source of the hashish that she had bought from Ross; but "[t]here was no indication that PFC Spaulding was involved in any of the transactions."

Soon after Investigator Curio had purchased hashish from Ross at the Spauldings' apartment, she and Ross were apprehended at a nearby gas station by German police,[1] who then conducted a search of the Spaulding apartment. Meek and Woodward had been present during the search, it being normal procedure for the CID to work with the German police on a joint operation involving a military member. Spaulding was not "detained"; but "[h]e was asked to go to the apartment while they conducted the search, because the search was being conducted with his wife being a suspect, and not as he being a suspect of having committed any criminal activity."

The search resulted in the seizure of "some CID funds that had been used on the 5th and the 7th to purchase hashish from Ross, and a set of scales." Some "of the CID funds were found ... on a dresser in the bedroom" and some "in the wallet of Mrs. Spaulding." Meek and Woodward had taken PFC Spaulding into the kitchen to talk to him privately about serving "as an informant for our office." They had no "evidence to indicate that Spaulding was involved in any drug trafficking," although there had been a CID "raw data file" which "may have had something to do with a positive urinalysis."

Hylton's "name was given to" them by Spaulding. However, Hylton's nickname "Ness" was on a list of people found in the apartment by the German police; and this list would normally have been made available to the drug team. Thus, "Hylton would have eventually been interviewed by our office, once identified ... from the nickname."

Meek had been interviewing Ross at the CID office while Woodward was interviewing Spaulding. When Spaulding first "in-

1. Curio had been apprehended in order to pro- tect her cover.

criminated himself" in the interview, Woodward had come to Meek who "immediately advised Woodward to stop the interview with Spaulding and advise him of his rights." Ross, in his statement to Meek, had "implicate[d]" Spaulding in the drug sales to Investigator Curio; but this occurred after Woodward had advised Meek "that Spaulding had incriminated himself earlier."

Investigator Curio then testified at the motion to suppress about her transaction with Ross. On the evening of August 7, when for the second time she went to the Spauldings' apartment to buy hashish, appellant and his wife had been there; but appellant had gone "downstairs to work on a car with a friend of his." When Ross and Investigator Curio had been apprehended on the evening of August 7, she had not talked to Special Agent Meek because she did not want to compromise her cover.

Spaulding next testified on the motion to suppress. His version of events differed substantially from that of the government witnesses. According to appellant, at the time of the search of his apartment, he had "presumed that I was a suspect and they were going to bring me in, because they said when they w[ere] done I had to go to the police station and fill out a report." At that time, he had identified various suppliers of drugs. When he got to the CID office, he had not wanted to sign a statement but had been directed to do so by Special Agent Meeks. Finally, he had done so since he "got tired of the hassle." The information on his signed statement was the same that he had given in the kitchen, "except for the way they worded it"; and, before signing the statement, he had not been advised "that the information" he had "given to them in the kitchen could not be used against" him.

On cross-examination, Spaulding testified that "[t]he statement that they got right now is not the statement I gave them. They put their own words in that statement. That is why I refused to sign that statement. That is why Mr. Meeks threatened me." Appellant added that, "when I read that statement, in my lawyer's office, I almost had a heart attack. Because that is not the statement I gave them."

On further cross-examination, appellant answered in the affirmative to this question: "To conclude this, Private Spaulding, you state that you had nothing to hide from the CID, because you weren't guilty of any wrongdoing, correct?" He had brought up Hylton's name but had "said nothing admitting any guilt about any offenses to the CID." When questioned by the military judge, Spaulding conceded that he had "voluntarily agreed to talk with" the investigator, but he was "disputing" their testimony about what he had said to them. Still later, on redirect, he claimed that he "felt like ... [he] had to do something for CID" in order "to protect" his "family."

After considering the contentions of the parties, the military judge made special findings of fact. He found that until about 10:00 p.m. on August 7, 1986, when Spaulding "implicated himself as being personally involved in a drug transaction," neither Woodward nor Meeks had "subjectively consider[ed]" him to be "a suspect." However, they should have "reasonably" suspected him at the time of the interview in the kitchen "and should have ... advised" him "of his rights under Article 31 and the Fifth Amendment."

Apart from the absence of any warning, "the statements" Spaulding "made in the kitchen and subsequent thereto were made freely and voluntarily." At 10:00 p.m., appellant had been .properly advised of his Article 31 rights, which he "affirmatively waived." Thereafter, he "freely and voluntarily made another incriminating statement," which "was not coerced from" him.

The military judge also found that there was not any exploitation or use ... of any action calculated to undermine the accused's exercise of his free will with respect to the statements made by the accused following the proper rights warning and the express voluntary waiver thereof. Particularly, there

was no exploitation by the agents of the accused's concern for his wife, or his Commander, or any promise of leniency, or other type of inducement which might be considered improper.

Based on his findings, the military judge suppressed any "admissions and statements made by" Spaulding up until about 10:00 p.m. when he was "properly advised of his rights"; but "[a]ll subsequent statements" were ruled admissible. Also, he held that testimony by Hylton would be "admissible."

## II

### A

■ As this Court ruled in one of its earliest opinions, a confession is not automatically inadmissible, even though it was made after another confession which was clearly involuntary. *United States v. Monge*, 1 USCMA 95, 2 CMR 1 (1952). The prosecution must rebut the presumption that the later confession was the result of the same influence which led to the prior confession. However, an involuntary confession whereby one "let[s] the cat out of the bag" does not preclude the prosecution from showing that a later confession resulted from a different cause than that which rendered the prior confession involuntary. *Id.* at 98, 2 CMR at 4. *See United States v. Bayer*, 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398–99, 91 L.Ed.2d 1654 (1947).

In *United State v. Seay*, 1 MJ 201 (CMA 1975), where a claimed violation of Article 31(b) was involved, the lead opinion observed that "the existence of an improper statement must be considered together with the surrounding circumstances in determining whether the former statement

tainted the latter." 1 MJ at 204. It also quoted this language from *United States v. Wimberley*, 16 USCMA 3, 9, 36 CMR 159, 165 (1966), with approval:

> Where there are successive statements, it is not a precondition to the admission of a properly obtained statement, that the accused be informed that a previous statement cannot be used against him.

1 MJ at 203–04. In *United States v. Byers*, 26 MJ 132, 135 (CMA 1988), the Court held that any "presumptive taint" resulting from an investigator's noncompliance with Article 31(b) could be cut off when the warning was given. *See United States v. Wimberley, supra.*

■ Accordingly, we conclude at the outset that the military judge's finding that Spaulding should reasonably have been a suspect when interviewed in the kitchen and initially at the CID office[2] does not inevitably require exclusion of the statement he made later after being advised fully of his Article 31(b) rights.

### B

In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court ruled that obtaining an unwarned statement from a suspect in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), did not create any presumptive taint as to a later statement given after he had been advised of his rights. In *United States v. Ravenel*, 26 MJ 344 (CMA 1988), the lead opinion concluded that a violation of the statutory warning requirement prescribed by Article 31(b) was less akin to a *Miranda* violation than to obtaining an involuntary statement; and, so, "a presumptive taint" resulted

---

**2.** In finding that "subjectively" Meeks and Woodward did not consider appellant to be a suspect when they first interviewed him, the judge obviously accepted their testimony. In finding that they "reasonably" should have suspected Spaulding at that time, the military judge took into account the evidence that Spaulding and his wife were the only adults living in an apartment where, in appellant's presence, she twice had supplied hashish for sales made by

Ross to Investigator Curio. Of course, if the agents should have "reasonably" suspected Spaulding when they were questioning him, the Article 31(b) warning requirement applies, regardless of their subjective state of mind. The Government cannot profit by the ignorance or gullibility or negligence of its investigators. *See United States v. Collier*, 1 MJ 358, 360 (CMA 1976).

from a violation of this requirement. *Id.* at 350. One of the separate opinions in *Ravenel* concluded that Article 31(b) had not been violated; and both separate opinions apparently rejected the view that any "presumptive taint" arises from an Article 31(b) violation.

 Whether Spaulding's unwarned and incriminating statement created "a presumptive taint," his signed statement was admissible if the Government established that it was preceded by an Article 31(b) warning and was not the product of the earlier violation of Article 31(b). *Cf. United States v. Byers, supra.* We conclude that, on the evidence before him, the military judge was free to find that the statements Spaulding made after being warned were not the product of any earlier unwarned admission.

In this connection we note that, according to appellant's own testimony, he had nothing to hide and, in view of his concern for his wife, wanted to cooperate with the investigators. Similarly, the government witnesses testified that Spaulding was willing to become an informant because he thought that by his cooperation, he could ultimately aid his wife with the German police and perhaps improve his relations with his own commander. Furthermore, although Spaulding testified that he had revealed Hylton's name during the original discussion in the kitchen, he never specifically asserted that, because of this admission at that time, he later decided that he might as well make a full confession.

Indeed, appellant's central complaint at trial was that, after he had received a full warning of his rights and had cooperated fully with the investigators, they forced him to sign an incriminating statement which was totally at odds with what he had told them. Obviously, the military judge did not accept Spaulding's version of events.

## C

 If, as asserted by the government witnesses, Hylton's name was first revealed after Spaulding had been advised of his rights, any evidence secured from Hylton was derived from a legally obtained statement; and so his testimony would clearly be admissible. Thus, any testimony by Hylton could be considered "tainted" only if, as Spaulding claimed, he had revealed Hylton's name to the investigators during the discussion in the kitchen.

Mil.R.Evid. 304(b)(3), Manual for Courts–Martial, United States, 1984 (Change 2), prohibits use of certain "derivative evidence." However, there is some question as to whether, under Mil.R.Evid. 304(b)(3), the testimony of a witness should be treated like other types of evidence challenged as having been "deriv[ed]" from illegal investigative action. *Cf. United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

Our analysis is complicated by the broad definition of the term "involuntary" in Mil.R.Evid. 304(c)(3):

> A statement is "involuntary" if it is obtained in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, *Article 31,* or through the use of coercion, unlawful influence, or unlawful inducement.

(Emphasis added.) The Supreme Court has held that limitations on use of "involuntary" statements sometimes are greater than on use of statements obtained in violation of the *Miranda* rules. *Cf. Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

However, by grouping Article 31 violations with violations of the Fifth Amendment, Mil.R.Evid. 304(c)(3) seems to equate statements obtained in violation of Article 31(b) with statements that are the result of "coercion." *Cf. United States v. Ravenel, supra* at 349–50. Also, since *Miranda* sought to safeguard an accused's Fifth-Amendment self-incrimination privilege, the language of Mil.R.Evid. 304(c)(3) might even be interpreted as a rejection of the

**162**

distinction made by the Supreme Court in *Mincey v. Arizona, supra.*

Even evidence challenged as "derivative" from an involuntary statement is admissible "if the military judge finds by a preponderance of the evidence that" it "was not obtained by use of the statement, or that the evidence would have been obtained even if the statement had not been made." Mil.R.Evid. 304(b)(3). The testimony of the government witnesses made clear that Hylton's identity would probably have been ascertained from the list seized in the search. Moreover, even if Spaulding had previously mentioned Hylton's name to Woodward while they were in the kitchen, the name was mentioned again when appellant made voluntary statements after being warned. Thus, we conclude that the information about Hylton was not tainted by any prior unwarned statement; and so the military judge properly denied the defense motion to suppress the testimony of Hylton.

## III

The decision of the United States Army Court of Military Review is affirmed.

SULLIVAN, Judge, concurs.

COX, Judge (concurring):

As is sometimes the case, the headnotes (which should *NEVER* be relied on except as an *aid* to the reader) in *United States v. Ravenel*, 26 MJ 344 (CMA 1988), represent the view of the author of the opinion and do not reflect a majority view.[1] As the lead opinion in *Ravenel* correctly states, I have rejected the notion that "warned" statements which are given subsequent to ones previously obtained without the warning required by Article 31, Uniform Code of Military Justice, 10 USC § 831, are presumptively tainted. *Id.* at 350. That does not mean, however, that I would accept subsequent statements merely because the warning was given. Rather, I believe what was said in *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222 (1985):

> The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.

I need not, however, apply that test to the facts presented in this case. Here, appellant is not claiming that the subsequent statement was prompted because he had already "let the cat out of the bag"[2] in his previous unwarned statements. Instead, he persists in his claim that he made no oral admission to the CID agents, either at his house or at their office, prior to receiving his rights warnings in accordance with Article 31. In short, appellant claimed that the written statement was fic-

---

1. The principal reason that I write is to maintain a respectable, but clear, distinction between "presumptive taints," "presumptive compulsions" and "actual facts." The lack of an Article 31, Uniform Code of Military Justice, 10 USC § 831, warning creates a "presumption of compulsion," *see Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985), and results in exclusion of the statements. Art. 31(d). Subsequent statements may or may not be "tainted," depending on the facts.

2. This phrase seems to have originated in *United States v. Bayer*, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed.2d 1654 (1947), a case involving an Army officer. It is interesting to note that Frederick Bernays Wiener, Esq., a respected military-law commentator, represented the interests of the United States. We have used the phrase on occasion. *See United States v. Alexander*, 18 MJ 84, 87 (CMA 1984).

In a different vein, I have learned that the phrase "cat out of the bag," often used in literature, had its roots in the county fairs and livestock markets of England. It comes from another familiar saying, "Don't buy a pig in a poke." Apparently a favorite ruse was to show a prospective buyer a piglet and place it in a "poke." The seller then substituted a bag with a cat in it rather than the pig. A smart "mark" would want to see the pig and thus "let the cat out of the bag." Thus, the term "let the cat out of the bag" was coined to counter buying a "pig in a poke." I guess that it was difficult to catch the cat after it got out of the bag! William and Mary Morris, *Morris Dictionary of Word and Phrase Origins* 100 (2d ed. 1988).

tional, created by CID agents, which he had been forced to sign: a product of some other "poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

The military judge rejected appellant's claim and made essential findings that this was not the case. Thus, appellant cannot now aver on appeal the theory that his written statement was somehow tainted by an earlier, unwarned statement. But even if he could, I agree with the majority that the information about Hylton was obtained lawfully.