**UNITED STATES, Appellee,**

v.

**David A. PHILLIPS, Seaman Recruit,
U.S. Navy, Appellant.**

No. 63,915.
NMCM 88–4279.

U.S. Court of Military Appeals.

Argued Oct. 4, 1990.

Decided Feb. 5, 1991.

For Appellant: *Lieutenant Robert E. Wallace*, JAGC, USNR (argued); *Lieutenant Commander P. McNeill Jones*, JAGC, USN, and *Lieutenant Debra R. Sandifer*, JAGC, USNR (on brief); *Lieutenant Jeffrey S. Horwitz*, JAGC, USNR.

For Appellee: *Lieutenant John J. Mulrooney, II*, JAGC, USNR (argued); *Commander Thomas W. Osborne*, JAGC, USN (on brief).

*Opinion of the Court*

EVERETT, Senior Judge:

A special court-martial, comprised of a military judge sitting alone,[1] convicted appellant, contrary to his pleas, of disrespect to a petty officer and 14 specifications of obtaining $2,521.47 worth of long-distance telephone services under false pretenses.[2] Thereafter, the judge sentenced appellant to a bad-conduct discharge and confinement for 2 months. The convening authority approved these results, and the Court of

---

**1.** Appellant was represented by an Air Force counsel.

**2.** These offenses were violations of Articles 91 and 134, Uniform Code of Military Justice, 10 USC §§ 891 and 934, respectively. Additionally,

appellant had been charged with—but was acquitted of—one specification of failing to go to his appointed place of duty and one specification of being incapacitated for duty due to prior consumption of alcohol.

Military Review affirmed. 30 MJ 1105 (1989).

Upon appellant's petition, we agreed to consider whether the Court of Military Review erred when it concluded that the military judge properly had ruled appellant's confession to Special Agent Hurley was voluntary. We hold that it did, and we remand the case to that court to consider whether appellant was prejudiced by this error and, if so, to take appropriate corrective action.

I

After his arraignment, appellant moved "to suppress false statements made by Seaman Recruit Phillips to agents of the Naval Investigative Service and all command representatives during interrogations conducted by them." Prior to trial, each side had served the other with written pleadings concerning the motion; so, after the military judge had noted "that the Government is the burdened party as it relates to an evidentiary matter that the Government would be pursuing," both sides offered evidence on the motion.

Apparently, Phillips began making private, long-distance telephone calls from government telephones in August 1987, and he began accepting charges for private calls on government phones in October of that year. The matter first came to the military's attention on January 21, 1988, when a woman from the telephone office called Aviation Boatswain's Mate First Class Lirot, appellant's leading petty officer, to tell him that their logs reflected Phillips' involvement in these calls. Evidence produced later in the trial indicated that many of the numbers to which long-distance calls had been placed on the government phones and many of them from which the collect calls had originated were identical to numbers that were on Phillips' private phone bill—numbers that belonged to his wife, mother, and mother-in-law.

After a driver had returned to give Lirot a copy of the telephone logs, Lirot called Phillips into his office to counsel him for-mally. At no time during this interview did Lirot advise Phillips of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. When first asked about the calls, Phillips denied any knowledge of them. After he was shown the list of numbers, however, he acknowledged making and receiving them. Lirot counseled Phillips about his financial situation generally and specifically suggested that he go to the telephone office to make arrangements to pay for the calls, which Phillips agreed to do. At the end of this interview, Lirot completed a counseling form, and Phillips signed it. The form "covered, that I used government phones, that I was counseled by him [Lirot], that I agree not to use the phones any more and that I have been counseled and I said I would never do it again."

Thereafter, Phillips went to the phone company and began a voluntary allotment. The same woman who initially had alerted Lirot to the matter later telephoned him to say that "it was taken care of."

Either shortly before or after this counseling session (the record is unclear), Lirot informed Phillips' division officer, Lt(jg) Dale, about the calls. Later that same day, Dale summoned Phillips to her office; Lirot and Chief Petty Officer Rostron also were present.

When Phillips arrived, "he sat down on my couch and I said, Phil, you don't have to answer any of these questions, if you want to leave you can. You don't have to talk to me, but I just want to let you in on what's happening." Dale "didn't officially read him his rights under Article 31." When trial counsel asked her, "Did you know what you were doing was wrong?"—an apparent reference to her failure to warn Phillips—she replied, "Yes."

At this point, Dale "explained to him about the phone calls and I said, 'Are these your phone calls?' And he said, 'Yes.' And I said, 'Why did you do it?' and he said, 'I don't know.'" When defense counsel asked Dale why she had called Phillips to her office, she responded, "I wanted to talk

to him about the phone calls and let him know what his actions were probably going to lead to so it didn't come as a shock to him." Defense counsel inquired whether she had "told him that he would be heading toward the brig"; and she answered, "I don't recall if I said it as specifically as that. But I may have said that that was a possibility."

Phillips testified that, after he had taken a seat on Dale's couch, Dale

said, "Phillips, I see you've made some phone calls," and I didn't say nothing. She says—she says—the first thing she was saying, well, I don't know what the telephone people are going to do about you making phone calls to the barracks phones but I'm going to refer this to Captain's Mast. I just sat there, I hadn't spoke to her. She said, well, what do you want to do about paying them back. I said, well, I'm going to pay it back to the best of my ability, you know.

The military judge's written "Essential Findings" that are appended to the record accept the substance of Phillips' testimony as to this interview, including Dale's advice "that the matter would be referred to Captain's Mast for disposition."

After Dale's interview, a report chit was written. Subsequently, Aviation Electrician's Mate Chief Cox was appointed to investigate the matter. Cox sought a mutually convenient time to interview Phillips, and finally the two met on February 8.

Cox began by advising Phillips of his Article 31 rights: "I read it right off the sheet that I had him sign." Then Cox "read what was written on the report chit and I asked him if he had any comment whatsoever. . . . It was just, 'Yes, I did it. So what,' and that was it." In an effort to get some more expansive response from Phillips, Cox asked him to " 'please write down what you feel' because I've done this once before. The last man that I had in there I had wrote down a page and a half of why he had done whatever. This one, there was nothing, [just an oral response of] so what I did it."

Ultimately, the matter was referred to the Naval Investigative Service, and Special Agent Hurley was assigned to the case. He spoke with Dale and Rostron about the earlier investigation and apparently learned of Phillips' admissions to making and receiving certain private, long-distance calls on government phones. Hurley interviewed Phillips on March 7, approximately 1 month after the last of the three interviews by command personnel. Hurley read and explained Phillips' rights to him, and he obtained Phillips' written acknowledgement that he understood and waived them. Hurley then explained to Phillips in some detail why he was being interviewed, including showing him the telephone logs.

As a starting point to this dialogue, Hurley had informed Phillips that he knew there had been a prior investigation by the command and that he knew, also, that Phillips had started an allotment to pay for many of the telephone charges. He did not make explicit mention of the earlier interviews or of Phillips' prior oral admissions— or advise Phillips that any earlier admissions could not be used against him (a so-called "cleansing warning"). Phillips acknowledged the personal calls and explained the circumstances surrounding his making them. Subsequently, Phillips' responses were reduced to writing, which he signed.

During litigation of appellant's motion, trial counsel acknowledged that the admissions to Lirot and Dale were flawed due to failure preliminarily to warn appellant of his Article 31 rights. Although trial counsel orally argued that the interview by Cox had been conducted properly, she indicated that "the only admissions we intend to use are those that he made to Special Agent Hurley nearly a month later."

At last, the military judge suppressed admissions made to Cox but admitted those made to Hurley. He reasoned:

As to the verbal statements purportedly given . . . to Chief Cox, the Government has made no evidentiary showing of the preliminary warning given the accused

during that interrogation. A warning including appropriate elements of Article 31, UCMJ and the requirements of *Tempia* and *Miranda [see* 16 USCMA 629, 37 CMR 249 (1967)] has not been demonstrated. [The judge's written "Essential Findings" shows that the fatal omission was "evidence of an advisement of counsel rights."] And accordingly as to that statement the motion is granted. As to the statement given ... to Special Agent Hurley on 7 March 1988, that portion of the motion is denied. The court is satisfied that this statement was proceeded [sic] by appropriate warning, was a voluntary statement and would have been provided in spite of the earlier unwarned statements made by Seaman Recruit Phillips.

The military judge's written "Essential Findings" that are appended to the record shed further light on his analysis leading to the ruling permitting use of the admissions made to Hurley:

> [T]he court was satisfied that SR Phillips was properly advised of his rights as a suspect, waived those rights and made a voluntary statement. Nearly 30 days had elapsed since the interview with AEC Cox and 46 days had elapsed since the counseling sessions with PO1 Lirot and LT(JG) Dale. Accordingly, the court concluded that the statement made by SR Phillips was not derivative of the earlier unwarned statement but rather was based upon his voluntary disclosure to Special Agent Hurley.

## II

A number of fundamental facts and legal principles are not in dispute at this stage. The admissions that Phillips made to Lirot and to Dale were pursuant to questioning that, in neither instance, was preceded by warnings of Phillips' various rights under Article 31; thus, they were involuntary. Mil.R.Evid. 304(c)(3) and 305(a), Manual for Courts–Martial, United States, 1984. Similarly, given the military judge's findings regarding omission of critical counsel rights preceding questioning by Cox, ad-

missions made during that interview were involuntary, as well. *Id.*

The question before this Court is whether admissions made to Agent Hurley approximately 1 month after these other interviews—admissions that *were* preceded by proper rights warnings—were somehow induced by those earlier, unlawful interrogations so as to render them, too, involuntary. *See* Mil.R.Evid. 304(c)(3); *see also* Mil.R.Evid. 304(b)(3). Phrased in the declaratory rather than in the interrogatory form, Phillips' admissions to Hurley were "admissible if the Government established that [each] was preceded by an Article 31(b) warning *and was not the product of the earlier violation of Article 31(b).* *Cf. United States v. Byers,*" 26 MJ 132 (CMA 1988). *United States v. Spaulding,* 29 MJ 156, 161 (CMA 1989)(emphasis added).

In *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court distinguished between two classes of "involuntary" statements and between the impact of each on a subsequent interrogation. Where a confession is obtained at a lawful interrogation that comes after an earlier interrogation in which a confession was obtained due to *actual* coercion, duress, or inducement, the subsequent confession is presumptively tainted as a product of the earlier one. On the other hand, where the earlier confession was "involuntary" only because the suspect had not been properly warned of his panoply of rights to silence and to counsel, the voluntariness of the second confession is determined by the totality of the circumstances. The earlier, unwarned statement is a factor in this total picture, but it does not presumptively taint the subsequent confession. *Id.* at 309–14, 105 S.Ct. at 1293–986.

For some time, there was some uncertainty whether the Court's decision in *Elstad* fully applied in the military or whether, instead, a more protective standard was indicated by Article 31 in the latter situation. For instance, in *United States v. Ravenel,* 26 MJ 344, 349 (CMA 1988), I wrote:

[W]hile Article 31(a) and the Fifth Amendment coincide in scope and while Article 31(b) was enacted to serve the purpose of avoiding coerced statements in violation of both provisions, unique factors in the military environment—unknown in the civilian setting—lead us to interpret Article 31(b) as being broader in the scope of its protection than is the mandate of *Miranda*. Both the subtleties of the superior-subordinate relationship and the conditioned response, consciously created from the first day of basic training, to respond almost unthinkingly to the wishes of a military superior can permit no other result.

(Footnote omitted.) Accordingly, I concluded that "the legislative sensitivity to the subtleties of superior-subordinate relationships in the military" and the President's similar sensitivity in grouping together both unwarned confessions and compelled confessions as "involuntary" in Mil.R.Evid. 304(c)(3) give rise to a presumptive taint carrying over to a later interrogation in an instance of either a compelled earlier confession or an unwarned earlier confession. *Id.* at 349–51.

Later, however, I acknowledged that the separate opinions by Judge Cox and Judge Sullivan in *Ravenel* "apparently reject the view that any 'presumptive taint' arises from an Article 31(b) violation." *United States v. Spaulding, supra* at 161. If there was any doubt about where the majority of this Court stood on this issue, it was put to rest less than 5 months ago in *United States v. Steward*, 31 MJ 259 (CMA 1990). There, a majority held that the Court of Military Review had erred by "resort[ing] to the presumptive taint doctrine" where it had "found only a technical violation of Article 31(b)." *Id.* at 264. Instead, the majority declared, "The appropriate legal inquiry in such a case is whether his subsequent confession was voluntary *considering all the facts and circumstances of the case* including the earlier technical violation of Article 31(b)." *Id.* at 265 (footnote omitted).

■ Even absent a presumption of taint, of course, the scales are not evenly balanced between the parties in litigating a motion of this sort. As the military judge acknowledged at trial, the Government must shoulder the burden to prove "by a preponderance of the evidence that a statement by the accused was made voluntarily before it may be received into evidence." Mil.R.Evid. 304(e)(1). *See also* Mil.R.Evid. 304(e)(3):

> Evidence that is challenged under this rule as derivative evidence may be admitted against the accused if the military judge *finds by a preponderance of the evidence* that the statement was made voluntarily, *that the evidence was not obtained by use of the statement,* or that the evidence would have been obtained even if the statement had not been made.

(Emphasis added.)

■ In this case, we hold that the Government failed to carry that burden. In attempting to convince this Court otherwise, the Government has cited us to several factors, such as the fact that Hurley was not the same questioner as at any of the preceding interviews; that Hurley's session with Phillips came long after the earlier ones; that Hurley made no direct reference to Phillips' earlier admissions; and that Phillips never testified that he actually had felt induced by the earlier interviews to make his admissions to Hurley (*see United States v. Spaulding, supra* at 161). *See also United States v. Seay*, 1 MJ 201, 204 (CMA 1975).

Our consideration of the totality of the circumstances, however, is not merely an exercise in counting how many factors weigh on each side of the issue, for all factors are not evenly weighted under all circumstances. Instead, it is our task to discern whether the circumstances as a whole satisfy us that Phillips' admissions to Hurley were made voluntarily. *United States v. Steward, supra.* This means that—considering all the circumstances—there must be a showing that an admission was not made as a result of the question-

er's using earlier, unlawful interrogations. Thus, most precisely, our task under the circumstances of this case is to determine whether *the Government has shown by a preponderance of the evidence* that Phillips' admissions to Hurley were *not* obtained by use of the earlier statements.

It is true, as the Government contends, that Hurley had played no role in the earlier interviews; that his session with Phillips came a month after the others; and that he made no specific reference to Phillips' earlier admissions. It is also true, however, that Hurley began his interview of Phillips by indicating that he was aware of the earlier investigation that Phillips' command had conducted and was aware, too, of Phillips' voluntary allotment to pay for the phone charges—an allotment which was, itself, directly the product of one of the earlier interviews.

Surely, such references quite effectively bridged the gap between the earlier interviews and the one that then was about to begin. The inference to be drawn from such innuendo is just as clear and ineluctable as if Hurley had said it outright: He was relying on the earlier sessions and Phillips' earlier admissions as a starting point for the current questioning. *See United States v. Seay, supra.*

Had Hurley given Phillips a "cleansing warning," our conclusion might not be the same. While such a warning is not legally required, *see United States v. Spaulding, supra* at 160, its absence certainly is of no help to the Government where, as here, the questioner makes bootstrapping reference to the earlier interviews.

Two other factors buttress our conclusion in this case. First, as the military judge found, Dale had "advised SR Phillips that the matter would be referred to Captain's Mast for disposition." If Hurley had not made such pointed reference to the command's earlier investigation, this might

be an unimportant consideration. Here, though, Hurley did expressly remind Phillips of the earlier investigation—and part of that earlier investigation was Dale's representation that the matter was going to mast. While Dale, at the time she made this representation, might well not have intended it to be an *assurance,* as a practical matter we believe that a member of the fleet—having been given such advice and having been reminded of it inferentially by Hurley—might well believe that there was no reason *not* to be forthcoming to Hurley.

Second, although the Court of Military Review "highlight[ed] the fact that in this case there is no hint of any bad faith on behalf of the Government in its course of dealing with appellant," 30 MJ at 1107, we do not read the record likewise. Dale candidly acknowledged to trial counsel that she knew that her questioning of Phillips without having given him his rights' advisement was "wrong." [3]

We are unwilling to conclude positively, on the basis of this one answer alone, that the command generally or Dale specifically had set up this whole scenario. Regardless, the result of the intentional violation of Article 31(b) is the same. The existence of a chain-reaction, reflex response of verbal and physical admissions during a series of unlawful interviews—at least one of which occurred when the interviewer knew that it was "wrong"—makes Phillips' admissions to Hurley, in an interview that at long last was preceded by proper rights' advisements, hardly surprising. The expressed and fairly implied bad faith in the staging of this scenario had consequences as a matter of fact; and now it must have consequences as a matter of law.

We hold that, considering all the facts and circumstances of the case, including the three earlier violations of Article 31(b), Phillips' admissions to Agent Hurley were

---

3. We are unsure why the *prosecutor* would have asked this question—unless, for some reason, she anticipated the opposite answer. We are even more puzzled by why *defense* counsel did not leap to the opportunity during his cross-examination of Dale and hammer at her apparent indifference to the niceties of Article 31(b); instead, he made not even an oblique reference to it, notwithstanding trial counsel's focusing upon it.

not voluntary. Thus, the military judge erred in admitting them into evidence.

## III

As mentioned earlier in setting out the facts of this case, there was, however, significant independent evidence of Phillips' guilt of having made or accepted personal, long-distance phone calls on government telephones. Additionally, part of the findings of guilt concerned similar phone calls that Phillips continued to make *after* his interview by Hurley.

Under these circumstances, we believe that it is appropriate to return this case to the Court of Military Review. That court then can determine whether improper consideration of Phillips' admissions was prejudicial as to the findings and, if so, whether and to what extent Phillips' sentence also should be reassessed.

## IV

The decision of the United States Navy–Marine Corps Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Navy for remand to that court for further review.

Chief Judge SULLIVAN concurs.

COX, Judge (dissenting):

I dissent. *See United States v. Steward,* 31 MJ 259 (CMA 1990). Under the circumstances of this case, the Government met its burden of proving the last confession totally voluntary.