UNITED STATES, Appellee

v.

Alvin N. CUENTO, Aviation Structural Mechanic
Second Class
U.S. Navy, Appellant

No. 03-0389

Crim. App. No. 200100281

United States Court of Appeals for the Armed Forces

Argued April 21, 2004

Decided July 27, 2004


CRAWFORD, C.J., delivered the opinion of the Court, in
which GIERKE, EFFRON, BAKER, and ERDMANN, JJ., joined.

<u>Counsel</u>

For Appellant: Lieutenant Rebecca S. Snyder, JAGC, USNR
(argued).

For Appellee: Lieutenant Frank L. Gatto, JAGC, USNR (argued);
Commander R. P. Taishoff, JAGC, USN (on brief); Lieutenant Ross
W. Weiland, JAGC, USNR.

Military Judge: C. R. Hunt




**<u>THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION</u>**.

Chief Judge CRAWFORD delivered the opinion of the Court.

Before a general court-martial of officers and enlisted members, pursuant to his pleas, Appellant was convicted of assault consummated by battery on a child under the age of 16 years, in violation of Article 128, Uniform Code of Military Justice [hereinafter UCMJ] 10 U.S.C. § 928 (2000).  Contrary to his pleas, he was convicted of two specifications of indecent acts with a child under the age of 16 years, in violation of Article 134, UCMJ 10 U.S.C. § 934 (2000).  The convening authority approved the court's sentence of a dishonorable discharge and four years' confinement.  The Court of Criminal Appeals affirmed the findings and sentence.[1]

This Court granted review of the following issues:

I.

WHETHER THE LOWER COURT ABUSED ITS DISCRETION BY
FAILING TO ORDER A DUBAY HEARING TO ASSIST IT IN
DETERMINING WHETHER THE PETITION FOR A NEW TRIAL
SHOULD BE GRANTED AND A NEW TRIAL ORDERED WHERE THE
TRIAL WAS A SWEARING CONTEST BETWEEN THE PARTIES AND
THE COMPLAINING WITNESS RECANTED HER ALLEGATIONS ON
FOUR OCCASIONS AFTER APPELLANT WAS TRIED.

II.

WHETHER APPELLANT'S CONFESSION WAS INVOLUNTARY WHEN
THE GOVERNMENT OBTAINED THE CONFESSION AFTER INFORMING
APPELLANT THAT HE WOULD NOT BE REUNITED WITH HIS
CHILDREN UNLESS HE ADMITTED THAT HE HAD SEXUALLY
MOLESTED HIS DAUGHTER, AND WHERE APPELLANT CONFESSED

---

[1] United States v. Cuento , 58 M.J. 584 (N-M. Ct. Crim. App. 2003).

> WITHIN DAYS OF A GOVERNMENT IMPOSED DEADLINE FOR
> ADMITTING HIS GUILT AFTER MAINTAINING HIS INNOCENCE
> FOR EIGHTEEN MONTHS.

### III.

> WHETHER THE LOWER COURT ABUSED ITS DISCRETION WHEN IT
> REFUSED TO CONDUCT A PLAIN ERROR ANALYSIS AND FOUND
> THAT ANY POTENTIAL ERROR WAS HARMLESS BEYOND A
> REASONABLE DOUBT WHERE THE GOVERNMENT VIOLATED
> APPELLANT'S SIXTH AMENDMENT RIGHT TO CONSULT WITH
> COUNSEL BY ELICITING TESTIMONY THAT APPELLANT RECANTED
> HIS ADMISSION ONLY AFTER CONSULTING WITH AN ATTORNEY
> AND BY ARGUING TO THE MEMBERS THAT APPELLANT'S
> RECANTATION WAS FALSE BECAUSE IT WAS MOTIVATED BY
> APPELLANT'S CONSULTATION WITH AN ATTORNEY.

For the reasons set forth below, we affirm the decision of the Navy-Marine Court of Criminal Appeals with respect to Issues II and III. As to Issue I, we return the record to the court below to order a fact-finding hearing pursuant to United States v. DuBay,[2] for the purpose of determining the credibility of J's post-trial recantation.

### FACTS

In August 1998, following J's allegations that Appellant had sexually assaulted her in October 1977, Appellant was removed from the family home and twice interviewed by the San Diego Police. He told the police that, while play-wrestling with J, he accidentally caught his hand in J's underwear and unintentionally penetrated her vagina with his finger. In September 1999, the local District Attorney declined prosecution

---

[2] 17 C.M.A. 147, 37 C.M.R. 411 (1967).

and the Navy Criminal Investigative Service (NCIS) assumed control of the investigation.

The California Child Protective Service, in coordination with the Navy Family Advocacy Program, devised a "reunification plan," by which Appellant, after appropriate therapy, could rejoin his family. Part of the therapy was for Appellant to admit to J's allegations. In fact, one of the rules of the therapy group provided that any participant who did not "believe that a molestation occurred" would not be allowed to complete the course of therapy necessary to be reunited with his or her family. To this end, Appellant attended group counseling sessions with Mr. Martin, a psychotherapist, from summer 1999 to spring 2000, and in January and February 2000. Appellant also saw Dr. Barnes, a clinical psychologist, for individual sessions.

Although Appellant had never admitted to the police that J's allegations were true, sometime in February 2000, he told Mr. Martin that he had done what J said he had done. About a week thereafter, at NCIS's invitation, Appellant went to NCIS, was advised of his rights, waived them, and gave the same version of events he had given to civilian police; however, when Special Agent (SA) Thomas pointedly expressed disbelief, Appellant "broke down" and admitted that in October 1997, he had twice put his finger in J's vagina. After confessing, Appellant

4

expressed great relief and signed the written confession admitted as Prosecution Exhibit 20.

Also in late February 2000, on his eighth visit to Dr. Barnes, Appellant admitted that J's allegations were true.  At their next meeting, Appellant offered no retraction or contradiction, but on his tenth visit to Dr. Barnes, Appellant said he had spoken with a lawyer, that he had been lying to Dr. Barnes at the last two sessions, that he was afraid of going to jail, and that he wanted to change his story.

## DISCUSSION

A.  Voluntariness of Appellant's Confession.

Appellant argues that his confession to NCIS was involuntary "because the government would not allow him to be reunited with his children until they reached adulthood if he did not admit his guilt before the termination of his second group therapy cycle, which was to end only days after he confessed."  We disagree and find Appellant's statement was both voluntary and independent of his statement to Mr. Martin.

> Voluntariness of a confession is a question of law that an appellate court independently reviews, de novo.  The necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker.  If, instead, the maker's will was overborne and his capacity for self-determination was critically impaired, use of his confession would offend due process. [3]

[3] United States v. Bubonics, 45 M.J. 93, 94-95 (C.A.A.F. 1996)(citations omitted).

"As this Court ruled in one of its earliest opinions, a confession is not automatically inadmissible, even though it was made after another confession which was clearly involuntary. The prosecution must rebut the presumption that the later confession was the result of the same influence which led to the prior confession."[4]

When there are multiple admissions by an accused and the voluntariness of a second or subsequent statement is challenged on the grounds that it is tainted by an earlier, illegally obtained statement, we have looked to the Supreme Court for guidance:

> In Oregon v. Elstad the Supreme Court distinguished between two classes of "involuntary" statements and between the impact of each on a subsequent interrogation. Where a confession is obtained at a lawful interrogation that comes after an earlier interrogation in which a confession was obtained due to actual coercion, duress, or inducement, the subsequent confession is presumptively tainted as a product of the earlier one. On the other hand, where the earlier confession was "involuntary" only because the suspect had not been properly warned of his panoply of rights to silence and to counsel, the voluntariness of the second confession is determined by the totality of the circumstances. The earlier, unwarned statement is a factor in this total picture, but it does not presumptively taint the subsequent confession.[5]

---

[4] United States v. Spaulding, 29 M.J. 156, 160 (C.M.A. 1989)(citing United States v. Monge, 1 C.M.A. 95, 2 C.M.R. 1 (1952)).

[5] United States v. Phillips, 32 M.J. 76, 79 (C.M.A. 1991).

When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession.

Only those statements that are "actually coerced" require application of the more stringent test generally described in Military Rule of Evidence 304(b)(3) [hereinafter M.R.E.] , as opposed to a showing of voluntariness by totality of the circumstances.[6]

While a so-called "cleansing statement" is a factor to consider in evaluating the voluntariness of a confession made following a prior, unwarned statement, this Court has held that "[w]here there are successive statements, it is not a precondition to the admission of a properly obtained statement, that the accused be informed that a previous statement cannot be used against him."[7]  However, "[i]f there has been an earlier unwarned statement, 'the absence of a 'cleansing' warning before

---

[6] United States v. Benner, 57 M.J. 210 (C.A.A.F. 2002); United States v. Steward, 31 M.J. 259, 264 (C.M.A. 1990)(citing Spaulding, 29 M.J. at 156; United States v. Ravenel, 26 M.J. 344 (C.M.A. 1988)).

[7] United States v. Wimberly, 16 C.M.A. 3, 9, 36 C.M.R. 159, 165 (1966).

the subsequent statement' is one of the 'circumstances to be considered in determining voluntariness.'"[8]

In determining whether Appellant's NCIS statement was voluntary, we will assume, arguendo, that his earlier statement was produced by the coercive effect of the prerequisites placed on Appellant's reunification with his family by the California Child Protective Service. "Evidence that was obtained as a result of an involuntary statement may be used when the evidence would have been obtained even if the involuntary statement had not been made."[9] "Even evidence challenged as "derivative" from an involuntary statement is admissible 'if the military judge finds by a preponderance of the evidence that' it 'was not obtained by use of the statement, or that the evidence would have been obtained even if the statement had not been made."[10]

Evaluating voluntariness, attenuation, and inevitability of Appellant's NCIS statement, we give particular weight to the following facts:

At the time of his NCIS statement, Appellant was 37 years old, with over 18 years of service in the Navy. The NCIS statement was made at the NCIS office, to which Appellant had

---

[8] United States v. Ford, 51 M.J. at 451 (quoting United States v. Lichtenhan, 40 M.J. 466, 470 (C.M.A. 1994)).

[9] M.R.E. 304(b)(2).

[10] Spaulding, 29 M.J. at 162 (citing M.R.E. 304(b)(3)).

been invited, but not ordered to appear. Appellant was not in custody. Appellant's statement to Mr. Martin was made at Mr. Martin's office, in the course of treatment in which Appellant had been ordered to participate. The NCIS statement was made about seven days after Appellant's first admission to Mr. Martin, with significant time for cool reflection and consultation with an attorney.

When SA Nelson invited Appellant to come to NCIS, she called him directly, rather than involving his command; consequently, Appellant arrived at NCIS without escort. Neither SA Nelson nor SA Thomas participated in Appellant's statement to Mr. Martin, nor were the agents aware of the "reunification plan." At NCIS, Appellant was oriented to his surroundings by SA Nelson and SA Thomas, and told that he was there voluntarily and could leave at any time.

SA Nelson advised Appellant of his rights, but did not give a "cleansing warning." Appellant indicated that he understood his rights and initialed beside each on the rights waiver form. At no time did Appellant ask for an attorney or indicate that he wanted to leave or stop answering questions. While the NCIS agents made reference to Appellant's statement to civilian police (alleging an accidental touching), no mention was made of Appellant's prior admission to Mr. Martin. No mention was made of the Child Protective Service's orders or conditions.

9

Before and during the interview, neither of the agents made any promises, inducements, or threats.  Although the agents used no unlawful coercion, when Appellant first told his story in accidental terms, SA Thomas told Appellant that he did not believe him.  Upon hearing this, Appellant confessed that he had done what had been alleged.  Appellant chose to have SA Nelson write his statement, rather than Appellant writing it himself.

After rendering the confession, Appellant said he felt that a huge burden had been lifted from his shoulders.  The statement process was very brief, lasting approximately 90 minutes.  Appellant read, made changes to, initialed, swore to, and signed the statement.

Under the circumstances of this case, particularly the intervening events between the first and second statements, the Government has carried its burden of demonstrating that the first statement did not taint the second statement, and that the second was voluntary.  The trial judge did not err in admitting the NCIS statement over defense objection.

B.    Comment on Appellant's Right to Counsel.

During the direct examination of Dr. Barnes, the trial counsel engaged the witness as follows:

> Q:  Okay.  Now, when, if ever, did the accused actually recant his version?
>
> A:  The following week, so two weeks after his initial disclosure of molest he came in a state of

agitation and told me that he wanted to again change his story.

     Q: Well, let's talk in a little bit more detail about exactly what he told you on that date. What did he tell you?

     A. He told me several things, <u>that he had met with his attorney and he was told that — let me back up</u>.

     Q. Okay.

     A. <u>I'd like to strike that, if I could.</u> It's important to get the sequence of events. He told me that he had been lying to me for the previous two weeks and that he now wanted to set the record straight one more time, that he reverted to the allegation that the abuse to his daughter occurred in an accidental fashion, as he had reported to me for the first seven weeks of therapy.

The trial counsel asked one more innocuous question of the witness and concluded his direct examination. We note that he did not follow the witness' reference to an attorney consultation with additional questions. However, in cross-examination, the trial defense counsel immediately did.

     Q. . . . You said you met with him two weeks later and he went back to the story he had originally gave; that was the wrestling story, right?

     A. That is correct.

     Q. <u>And you mentioned he had met with his attorney</u>?

     A. Yes.

     Q. Would that be me?

     A. Yes, it would.

Q.   Okay.  And the first time you met with him
was 28 February, right?

A.   That's correct.

. . . .

Q.   Okay.  Would it surprise you to know, sir,
that Petty Officer Cuento did not meet with his
attorney until after [March 13th]?

A.   It would only surprise me that I have the
date wrong.  When he met with me and revised his
story, he had met with an attorney.  It may have been
you, sir, but he had met with an attorney, at least
that's what he reported to me at that time, and he
started expressing fear that he would be placed in the
brig.  That was a new story to me on that day.

Q.   Do you know of any other attorney that he's
ever had?

A.   I don't know.

During the trial counsel's closing argument on findings, he

made the following comments:

Members, you've heard from Dr. Barnes.  He came
in last Friday, and he gave you a real good glimpse as
to exactly what was going on here.  And if you bring
in all the other evidence that you've heard, it makes
perfect sense.  You've got a man that comes into his
office on the 28th of February, four days after he
speaks with NCIS, on the 28th of February, and says,
"I'm guilty."  Another week goes by, on the 6th of
March or sometime around there, he comes back into the
office and says, "Doc, I'd like to talk with you a
little bit more about it.  I'm guilty, and the reason
that I'm telling you now is because the burden is so
great."  An then another week goes by.  He comes back
in, and he says, "Well, now, I've spoken with my
defense attorney; and now I'm – I don't want to be
guilty anymore.  I'm going to recant.  No longer am I
going to say I did this."[11]

---

[11] 58 M.J. at 593.

We need not decide whether the court below conducted a plain error analysis, as we conclude that even if the trial counsel erred in his examination of Dr. Barnes or his argument suggesting that Appellant recanted after having talked with his lawyer, any error was harmless. Because we also assume without deciding that the alleged error was of constitutional dimension, we conclude that any error was harmless beyond a reasonable doubt.

The members had an opportunity to hear and personally observe each witness and we assume that the members applied their "common sense and [their] knowledge of human nature and of the ways of the world."[12] The defense did not object to Dr. Barnes' statement or to trial counsel's argument. In this context, we have no difficulty concluding that if there was error, it was harmless beyond a reasonable doubt.

C.  The Court of Criminal Appeals' Failure to Order a Fact-finding Hearing under United States v. DuBay.[13]

For the reasons set forth below, we return the record of trial to the Navy-Marine Court of Criminal Appeals to order a DuBay hearing in which a military judge will determine the credibility of J's recantation of her trial testimony. The

---

[12] United States v. Rivera, 54 M.J. 489, 491 (C.A.A.F. 2001).

[13] 17 C.M.A. 147, 37 C.M.R. 411 (1967).

13

record of those proceedings will then be evaluated by the Court

of Criminal Appeals in determining whether to grant Appellant's

petition for new trial.

> On 10 January 2001, Mr. Douglas Brown, a civilian attorney representing the appellant during post-trial review, placed a telephone call to J. During a two-minute conversation, Mr. Brown asked J if she had told the truth or lied at trial when she testified that she had been molested by her father. She said that she had lied and would be willing to write a statement and speak to Mr. Brown's investigator. On 16 January 2001, J and her mother met with investigator Suzanne McDaniel. In the course of a 90-minute interview, most of which was transcribed verbatim, J recanted her trial testimony and stated that she had lied at trial in accusing her father of molesting her. She also signed an affidavit to that effect.[14]

Article 73, UCMJ,[15] permits an accused to petition for a new

trial within two years of the convening authority's action.

Rule for Courts-Martial 1210(f) [hereinafter R.C.M.] provides as

follows:

> (f) Grounds for new trial.
> (1) In general. A new trial may be granted only on grounds of newly discovered evidence or fraud on the court-martial.
> (2) Newly discovered evidence. A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:
> (A) The evidence was discovered after the trial;
> (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and
> (C) The newly discovered evidence, if considered by a court-martial in the light of all

---

[14] 58 M.J. at 587-88.

[15] 10 U.S.C. § 873 (2000).

14

other pertinent evidence, would probably produce a substantially more favorable result for the accused.

In United States v. Rios,[16] this Court discussed the Manual for Courts-Martial, United States (1998 ed.) new trial provisions:

> Petitions for new trial based on a witness's recantation "are not viewed favorably in the law." United States v. Giambra, 33 M.J. 331, 335 (C.M.A. 1991). They should not be granted unless "[t]he court is reasonably well satisfied that the testimony given by a material witness is false." Id., quoting Larrison v. United States, 24 F.2d 82, 87 (7th Cir. 1928).

> Recantations of trial testimony are viewed by federal courts with "extreme suspicion."

> Our standard of review on petitions for new trial is deferential. We review only for an abuse of discretion.

In United States v. Brooks,[17] we again explained the heavy burden on petitioners and the critical role of appellate courts in determining credibility:

> When presented with a petition for new trial, the reviewing court must make a credibility determination, insofar as it must determine whether the "newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused." RCM 1210(f)(2)(C). The reviewing court does not determine whether the proffered evidence is true; nor does it determine the historical acts. It merely decides if the evidence is

---

[16] 48 M.J. 268 (C.A.A.F. 1998), cert. denied, 525 U.S. 1156 (1999)(noting the consistency between R.C.M. 1210 and Fed. R. Crim. P. 33)(citations omitted).

[17] 49 M.J. 64, 69 (C.A.A.F. 1998).

sufficiently believable to make a more favorable result probable.

We find a Court of Criminal Appeals has abused its discretion when we reach "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors."[18] This is a textbook standard and involves "more than a mere difference of opinion."[19] After noting the standard with which to measure Appellant's petition for new trial and the circumstances under which J recanted her testimony, and rather than ordering a fact-finding hearing to assess J's credibility, the Court of Criminal Appeals assessed J's credibility on the strength of her post-trial affidavit. The court found that Appellant had "not met his burden of showing that J's trial testimony was false."[20] In so doing, the Court of Criminal Appeals noted that Appellant's case is not a simple "swearing contest," being instead a case in which the victim's trial testimony is corroborated by Appellant's NCIS statement and his admissions to counselors. While those distinctions are factually accurate as far as they go, they fail to account adequately for Appellant's repudiation of his prior statements,

---

[18] United States v. Houser, 36 M.J. 392, 397 (C.M.A. 1993)(citation omitted).

[19] United States v. McElhaney, 54 M.J. 120, 130 (C.A.A.F. 2000).

his facially rational explanation for having made the incriminating, but purportedly false statements, and the potential effect that mutually corroborative denials by Appellant and J may have at any future proceedings.

"[W]hen the alleged perjurer is the prosecutrix herself," we remain "disinclined" to burden Appellant with mechanical application of a rigorous standard.[21]  Under the unique circumstances of this case, including the lack of any corroborating physical evidence, that Appellant, both before and during trial, recanted his NCIS statement and his admissions to Dr. Barnes and Mr. Martin, and that J's testimony was the only other evidence against Appellant, we find that the weight of J's recantation cannot adequately be measured without a DuBay hearing before a military judge at which J would testify under oath and be subject to cross-examination.

### DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed as to Issues II and III.  As to Issue I, the decision of the court is reversed and returned to the Judge Advocate General of the Navy for submission to a

---

[20] Cuento, 58 M.J. at 590.

[21] Giambra, 33 M.J. at 335.

convening authority for a DuBay hearing.  Following that hearing, the record should be returned to the Navy-Marine Corps Court of Criminal Appeals for a determination of whether "[t]he newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused." See United States v. Brooks, 49 M.J. 64 (C.A.A.F. 1998).