# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**K.J. BRUBAKER, B.T. PALMER, A.Y. MARKS**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**DAVID W. NEIMAN**
**AVIATION BOATSWAIN'S MATE AIRMAN (E-3), U.S. NAVY**

**NMCCA 201500119**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 9 October 2014.
**Military Judge:** CAPT Robert B. Blazewick, JAGC, USN.
**Convening Authority:** Commander, Navy Region Southeast, Naval Air Station, Jacksonville, FL.
**Staff Judge Advocate's Recommendation:** CDR N.O. Evans, JAGC, USN.
**For Appellant:** Maj Benjamin Robles, USMC; LT David W. Warning, JAGC, USN.
**For Appellee:** Maj Suzanne M. Dempsey, USMC; LT James M. Belforti, JAGC, USN.

**26 July 2016**

------------------------------------------------------
## OPINION OF THE COURT
------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

PALMER, Senior Judge:

A panel of members with enlisted representation, sitting as a general court-martial, convicted the appellant, contrary to his pleas, of one specification of murder and one specification of obstructing justice in violation of Articles 118 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 934. The members sentenced the appellant to confinement for life with the possibility of parole, total forfeitures, and a dishonorable discharge. The convening authority approved the sentence as adjudged.

The appellant raises a single assignment of error, which contains three related sub-issues: (1) that Naval Criminal Investigation Service (NCIS) agents interrogated him in violation of Article 31(b), UCMJ, and the statements made prior to receiving his rights should have been suppressed; (2) that any statements made after he was advised of his Article 31(b) rights should have been suppressed as involuntary; and (3) that any statements made during his interrogation should have been suppressed in order to deter future violations of the Constitution by NCIS agents.

After considering the pleadings of the parties and the record of trial, we conclude that the findings and the sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant occurred. Arts. 59(a) and 66(c), UCMJ.

## BACKGROUND

At the time of the charged offenses, the appellant was a 29-year-old Aviation Boatswain's Mate (Handling) Third Class assigned to Naval Air Station (NAS) Meridian, Mississippi. He lived in base housing with his 34-year-old wife, Heather, to whom he had been married approximately four months. Heather suffered from a rare genetic disorder and a variety of other significant ailments that required dozens of surgeries over her lifetime and caused her severe chronic pain. As a result, she took numerous prescribed medications, to include hydrocodone, a synthetic opiate derived from codeine, which helped manage her pain. Heather died in the early morning hours of 19 January 2013, while lying in bed next to the appellant. A subsequent medical examiner's report concluded her death was caused by toxic levels of hydrocodone in her system.

On 5 November 2013, NCIS Special Agent (SA) AB and Investigator (Inv.) MS interviewed the appellant. Approximately five hours into the interview, they advised him that they suspected him of negligent homicide, manslaughter, and misprision of a serious offense, and gave him Article 31(b), UCMJ, rights. The appellant waived his rights and made several admissions related to his wife's death. Then, two hours after the initial rights advisement, SA AB added murder to the list of suspected offenses on the rights advisement form, which the appellant acknowledged and then stated he wished to continue the interrogation. Approximately 90 minutes later, the appellant told the agents that, knowing she had already consumed a significant number of hydrocodone pills, he put two more pills in Heather's soda and served the drink to her. He admitted she was unaware the pills were in her drink and that he gave her the hydrocodone in order to kill her and thus end her suffering.

The next day, during an NCIS pre-polygraph interrogation with SA JH, and after again being advised of his Article 31(b) rights, the appellant provided a more detailed confession of how he murdered his wife. Specifically, he stated that during the evening of 18 January 2013, Heather began acting like she was daydreaming and was staring blankly. He thereafter realized approximately 20 hydrocodone pills were missing from his wife's prescription bottle and when he asked her about it, she said she had taken some pills for her pain. Then, while preparing dinner, the appellant crushed ten hydrocodone pills on the kitchen counter, mixed them with soda in her favorite cup, and served the drink to her. She drank the entire contents during dinner unaware he had laced it with hydrocodone.

2

The appellant admitted that over the course of the night, he twice more crushed and mixed approximately ten hydrocodone pills each time in Heather's soda and served it to her. The appellant stated his wife died before she could finish the last drink. He admitted he thereafter cleaned the hydrocodone residue off the counter and rinsed out the cup so that "no one would know what I had done."[1] He stated the idea of killing her came to him earlier in the week after talking to his mother about Heather's life insurance. The appellant explained that he and Heather had a fight on 17 January 2013, which prompted him to "really start thinking about how it would be a win-win situation if I killed Heather. Heather had been in a lot of pain recently and I knew I would get the life insurance[.]"[2] The appellant stated he knew the medication would kill his wife, that he thought he was helping her by ending her pain, and that she "never gave me any indication that she knew [the pills were in her drinks]."[3]

## I. Whether the entirety of the appellant's unwarned statements should have been suppressed

At trial, the defense moved to suppress the appellant's 5 November 2013 statements made to SA AB and Inv. MS, arguing that the agents were required to read the appellant his Article 31(b) rights before questioning him. The defense claimed the agents believed the appellant was a suspect long before the 5 November 2013 interview, citing the following as support: that the agents were aware that the victim's sister and the appellant's former girlfriend both suspected the appellant of involvement in Heather's death; that SA AB attempted to conduct a telephonic oral/wire intercept of the appellant wherein she used "negligent homicide" as the suspected violation and referenced "negligent homicide" in an interim report of investigation; that they engaged in significant preparation in advance of the interview, to include attending a high level video-teleconference (VTC) with a senior NCIS official, arranging for the presence of a polygraph examiner at the interview, and SA AB drafting a list of 91 questions she intended to use during the interview that included a reminder to provide Article 31 (b) rights and several accusatory questions; and that they recorded the 5 November interview, which normally does not occur when interviewing witnesses. In response, the prosecution asserted the investigation was a death investigation in which accidental overdose or suicide was as plausible as homicide and that the appellant was not a suspect until he made incriminating statements during the 5 November interview.[4] The military judge ultimately granted the motion in part by suppressing the appellant's statement made in the 18 minutes prior to his rights advisement.

---

[1] Prosecution Exhibit 14 at 1.

[2] *Id.* at 2.

[3] *Id.*

[4] Although the trial counsel, in her 13 August 2014 Response to the Defense Motion to Suppress Statements of ABHAN Neiman to NCIS Investigators, conceded the appellant "should have been provided an Art. 31(b) UCMJ advisement at the beginning of the interview on 5 November 2013," when arguing the motion on 21 August 2014, she amended that position, saying instead "the vast majority of the morning [interview] session . . . did not involve the questioning of [a] suspect." Appellate Exhibit XVII at 9; Record at 252.

'"When there is a motion to suppress a statement on the ground that rights' warnings were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law *de novo*. '" *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014) (quoting *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000)). Under these standards, '"a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect.'" *United States v. Gilbreath*, 74 M.J. 11, 2014 CAAF LEXIS 1206, at 19 (C.A.A.F. Dec. 18, 2014) (quoting *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). "The abuse of discretion standard requires not that the judge was wrong, but rather was clearly wrong." *United States v. Byrd*, 60 M.J. 4, 12 (C.A.A.F. 2004) (Crawford, C.J., concurring in the result). Notwithstanding the "abuse of discretion" standard, the ultimate determination of whether a person interviewed is a suspect is a question of law that we review *de novo*. *United States v. Muirhead*, 51 M.J. 94, 96 (C.A.A.F. 1999).

Article 31(b), UCMJ, states:

No person subject to this chapter may interrogate, or request any statement from . . . a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

If an NCIS agent interrogates or requests a statement from a person suspected of an offense, that agent must advise the person of his or her rights under Article 31(b), UCMJ. "Whether a person is a suspect is an objective question that is answered by considering all the facts and circumstances at the time of the interview to determine whether the military questioner believed or reasonably should have believed that the servicemember committed an offense." *Swift*, 53 M.J. at 446 (citation and internal quotation marks omitted).

The military judge predicated his decision to suppress a portion of the 5 November interview on the following findings of fact:

1. Shortly after Heather's death, the lead agent, SA AB, interviewed Ms. SS, Heather's sister, who expressed suspicions about the appellant's involvement in her sister's death.[5] SA AB stated that she followed up on Ms. SS' potential leads, and that most of them did not pan out. Further, Ms. MB, the appellant's former girlfriend, made allegations against the appellant but SA AB testified Ms. MB's leads "led nowhere and that [she] was a drug user who expected to get money and stopped cooperating once she realized she would not get any."[6]

---

[5] Ms. SS told SA AB that the appellant had deleted some of Heather's e-mails; that she found the cup Heather had used the night she died, saw residue in it, and that the appellant eventually put the cup in the garbage; that the appellant seemed excited about getting life insurance money; and that the appellant was on dating websites shortly after Heather's death.

[6] AE LVII at 4.

2.  In August 2013, while touring regional installations and after receiving an informal brief on SA AB's only pending death investigation, the NCIS Executive Assistant Director for Pacific Operations organized a two-hour VTC with SA AB, Inv. MS, SA JH, two other agents, a forensic specialist, a judge advocate, and a psychologist to review the case.  As an undetermined death, the agents knew Heather died from an overdose of prescribed hydrocodone, but they did not know if the death was accidental, a suicide, or a homicide.  The VTC members agreed that the appellant was not "subject titled" and, because he had not been interviewed since 19 January 2013, he needed to be re-interviewed.  After the VTC, the Executive Assistant Director sent Inv. MS and a forensic specialist to NAS Meridian to help close the case.

3.  SA AB did not expect her list of 91 questions would elicit incriminating responses, and she saved the accusatory questions until the very end for this reason.  SA AB was "taken aback" when the appellant made admissions that required Article 31(b) warnings.[7]

4.  Inv. MS was an investigator-review specialist assigned to the NCIS cold-case homicide unit.  He believed this was "an overdose case but the cause of death remained undetermined."[8]  He recalled the August VTC focused on whether further investigation could change the case from "undetermined to a 'natural [death] or suicide or what it turned out to be.'"[9]  Inv. MS further stated because the appellant only made a "one-page statement immediately after his wife's death," that it was "the normal course of business" to get a final statement in undetermined death cases.[10]  Based on Heather's history of suicide attempts and her apparent overdose, Inv. MS believed this was "a death case and not a criminal case."[11]

5.  SA JH, a polygraph examiner, observed a majority of the interview/interrogation on 5 November.  Usually polygraph examiners are not present during interviews, but in this case the examiners were authorized to travel to NAS Meridian so that a polygraph could be administered quickly, if needed, before the appellant's imminent separation from the Navy.  SA JH initially believed this was not a criminal case, but at 1335, during a break in the 5 November interview, he recommended SA AB advise the appellant of his Article 31(b) rights.

The military judge organized the appellant's 5 and 6 November interview/interrogation into several phases, with Phases I-III provided in relevant part below:

Phase I – The beginning of the initial interview at 0838 until 1318—the point at which the military judge concluded that the agents "should have reasonably suspected the accused of committing an offense."[12]  The military judge found that the appellant said he wanted to talk with investigators, was pleased when he learned he was going to speak with NCIS, seemed

---

[7] *Id.* at 4.

[8] *Id.* at 3.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.* at 5.

5

happy to finish the investigation, and gave the agents permission to review his finances. The military judge further found that the agents' questions did not indicate they suspected him of culpability. After an hour-long lunch break, the appellant was "less open," prompting Inv. MS to tell him he "shouldn't hold back information because it makes [you] look bad and [we] don't want to do that."[13] When discussing Heather's favorite cup, the appellant was visibly more emotional, and at 1318, SA AB asked him why he threw the cup away.

Phase II – From 1318 to 1336, when the agents provided the appellant his Article 31(b) rights. During this phase, SA AB asked the appellant why he rinsed the cup before throwing it away. At 1330, they asked about Heather's prescription medication, and the appellant stated he kept control of the pills. At 1335, SA AB stopped Inv. MS from asking further questions and, immediately thereafter advised the appellant he was suspected of manslaughter, negligent homicide, and misprision of a serious offense and read the appellant his rights under Article 31(b), which he waived.

Phase III – From 1336 until 1552, when agents added "Article 118 (Murder)" to the appellant's written rights advisement in response to his statement that, while continuing to deny culpability in his wife's death, he wanted to "help ease her pain." The appellant then again read and acknowledged his rights.

The military judge issued several decisions on the suppression motion. First, on 12 September 2014, he found "the rights warnings [sic] were not involuntary" and thus admitted all of the appellant's statements made after rights advisement. He further found that the "agents subjectively believed they were not investigating an offense, and therefore, not required to warn," but he was still reviewing the record to determine "whether there is a point at which they should reasonably have suspected the accused and warned him."[14] On 18 September 2014, the military judge partially granted the defense motion to suppress after finding that SA AB and Inv. MS "should have reasonably suspected [the appellant] of an offense at [1317]"[15] and suppressed the appellant's statements from 1318 until 1336—when the appellant was provided and waived his rights under Article 31(b).[16] Then, in denying a defense request for reconsideration, he was "soundly convinced that [SA AB] did not suspect the accused on the 5th of November, when the questioning started that morning."[17] Finally, the written findings of fact and conclusions of law included an understanding that "[e]ven if the accused was warned when [the agents] first

---

[13] *Id.*

[14] Military Judge e-mailed Interim Ruling, enclosure (1) to Appellant's Clemency Request of 26 Feb 2015; AE LVII at 1 (referencing the 12 September e-mail).

[15] Military Judge e-mailed Interim Ruling, enclosure (1) to Appellant's Clemency Request of 26 Feb 2015 (1317 was approximately when the appellant became visibly more emotional after being asked about Heather's favorite cup).

[16] *Id.* The military judge also gave the defense the option to include the suppressed statements if they so desired under the rule of completeness per MILITARY RULES OF EVIDENCE 106 and 304(h), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.).

[17] Record at 789-90.

suspected him, the court must also determine whether they should reasonably have suspected the accused and warned him earlier."[18]

We exercise our fact-finding power to consider the additional essential facts enumerated below. *United States v. Doucet*, 43 M.J. 656, 659 (N.M.Ct.Crim.App. 1995); *see also United States v. Swan*, 45 M.J. 672, 680 (N.M.Ct.Crim.App. 1996) ("We need not rely upon the military judge to list the essential findings when, as in this case, they are apparent.").

1. Even though the telephonic oral/wire intercept request submitted on 26 February 2013 listed the appellant as a "target" and the suspected violation annotated thereon was "negligent homicide," SA AB testified a "target" does not mean the same thing as "suspect."[19] Further, SA AB explained she annotated her early report narratives as a "negligent homicide" in response to the family's suspicions, but all those leads were "coming up empty handed."[20] SA AB acknowledged she intermittently copied the phrase "negligent homicide" into newer report versions, but stated doing so was inadvertent since she had "no information to develop a suspect" for negligent homicide.[21] Also, long before the 5 November interview, NCIS deemed Ms. MB a non-credible, unreliable witness, and thus the telephonic wire intercept never occurred.

2. SA AB explained she video-recorded the 5 November interview because the family had previously contacted Congress with concerns NCIS was participating in a "cover up" to protect the appellant.[22] SA AB wanted to use the video to demonstrate the thoroughness of the interview and to show they, in fact, had asked all the "hard questions."[23] SA AB testified that she believed this was a routine death investigation; the various possible manners of death included accidental overdose, suicide, and homicide; and she was not leaning toward any particular possibility. Further, she did not believe the interview would elicit incriminating responses from the appellant and that she had no information to believe a crime had been committed related to Heather's death.[24]

3. Prior to the 5 November interview, Inv. MS believed that the case was a death investigation, vice a homicide case; that the appellant had yet to be extensively interviewed; that the case was going to be closed after the interview; and that he was not sure whether it was a

---

[18] AE LVII at 13.

[19] Record at 1050.

[20] *Id.* at 188.

[21] *Id.* at 959-60.

[22] *Id.* at 126; AE XVI at 40-41 (On 25 March 2013, Ms. SS, an attorney, e-mailed the Director of the Navy Casualty Branch demanding responses to her inquiries and stating her "next calls [were] going to be to the media, my congressmen, my governor, our secretary of state . . . and anyone else who will listen to me.").

[23] Record at 127, 971-72; AE XXXII at 148-51.

[24] Record at 118.

suicide or accidental overdose.  It was not until the appellant stated he had cleaned out his wife's soda cup that he thought, "this doesn't sound right."[25]

4.  SA JH, the NCIS polygraph examiner who conducted the appellant's 6 November interrogation, testified he and the other agents did not consider the appellant a suspect at the onset of the 5 November interview; that the appellant was not "subject-titled" in their investigation; and there were three possible manners of death, "homicide, suicide, and accidental."  Although homicide was a possible outcome, "that wasn't anything that anybody was necessarily prepared for when they [started the 5 November interview]."[26]

The absence  of these findings from the military judge's recitation of his otherwise detailed and comprehensive essential findings does not render the record incomplete.  *Swan*, 45 M.J. at 680.  We therefore adopt the military judge's findings of fact, as amended.

We next review the military judge's conclusions of law.  At issue is whether the military judge, in reaching his conclusions, gave too much weight to the agents' subjective belief that the appellant was not a suspect.  We agree that the military judge considered the agents' subjective opinions on whether the appellant was a suspect.  Indeed, the military judge, to varying degrees, referenced the agents' subjective opinions in each of his rulings.  He even went so far as to factor in the agents' "body language" when opining that neither suspected the appellant of a criminal offense.[27]  Additionally, the military judge's conclusions of law omit any citation to controlling case law identifying the appropriate objective standard for determining whether a person is a suspect.  Nevertheless, for the following reasons, we remain satisfied the military judge applied the correct standard.

First, as discussed *supra*, the military judge's preliminary rulings on 12 and 18 September 2014 both contained, as a predicate question, whether the agents "reasonably" suspected the appellant.[28]  Then, in his final findings of fact and in his conclusions of law, the military judge twice states the court's obligation to assess whether they should "reasonably have suspected the accused and warned him earlier."[29]  Each ruling, therefore, evidenced the military judge's understanding that the agents' belief must be reasonable.

Second, the military judge need not ignore the agents' subjective beliefs.  "[I]n some cases, a subjective test may be appropriate; that is, we look at what the investigator, in fact, believed, and we decide if the investigator considered the interrogated person to be a suspect." *Muirhead*, 51 M.J. at 96.  A military judge errs only when placing "great weight on the subjective opinions of the agents as to whether Article 31(b) rights were required" and thereby fails to view the issue objectively. *Id.* at 97.  Clearly, the military judge did not consider the

---

[25] AE XVII at 53-53a.

[26] Record at 1130-31, 1220-21.

[27] AE LVII at 14.

[28] Military Judge Interim Rulings, enclosure (1) to Appellant's Clemency Request of 26 Feb 2015.

[29] AE LVII at 5, 13.

agent's subjective beliefs to be dispositive because he discounted those beliefs when suppressing the appellant's statements made after SA AB asked him why he threw the cup away. Moreover, the military judge articulated several objective reasons for concluding the appellant was not a suspect. These include finding the case was an unresolved death investigation; recognizing the appellant, who was with his wife when she died, had only provided two cursory statements; and acknowledging the need to resolve the case before the appellant's pending separation.

Third, "a military judge . . . is presumed to know and follow the law." *United States v. Allen*, 31 M.J. 572, 602, (N.M.C.M.R. 1990) (citations omitted). Thus, the fact that the military judge did not cite specific cases expressly discussing the objective standard in his conclusions of law does not mean that he did not apply or understand the law.

For these reasons, we find the military judge understood and then applied the correct objective, reasonable man standard, giving appropriate, but not excessive, weight to the agents' subjective opinions, when properly concluding the appellant initially was not a suspect on the morning of 5 November.

Finally, we conduct our *de novo* review of the record to determine whether a reasonable person under the circumstances should have suspected the appellant of involvement in his wife's death. *See Muirhead*, 51 M.J. at 97 (conducting *de novo* review based on the overall record to determine whether a reasonable person under the circumstances would have considered a person a suspect, and finding fault with the lower court's assessment of the agents' subjective beliefs).

Here, the following information, available to investigators prior to the 5 November interview, supports an objectively reasonable belief that appellant was initially not a suspect: Heather died of an overdose of hydrocodone, a medication that was lawfully prescribed to her; she had attempted suicide in the past via drug overdose; she suffered from depression; she was in drug treatment for hydrocodone addiction; she was in extremely poor health and lived in chronic pain; the 60-pill prescription of hydrocodone, which was picked up on 17 January 2013, was found at her bedside with only five pills remaining; there was no evidence of a struggle or any injuries found on her; in a 19 January 2013 sworn statement, the appellant said his wife died in her sleep; the appellant appeared grief stricken the day she died; the appellant stated their marriage had no domestic issues and they were "laid back and mostly stay[ed] at home";[30] Heather's family stated they anticipated receiving a call someday that she had died of an overdose; Ms. SS had a strong bias against the appellant and alerted NCIS to the appellant's former girlfriend, Ms. MB; and, the suspicions raised by Ms. MB were deemed unsubstantiated and unreliable.

Additionally, we disagree with the appellant's conclusion that the August 2013 VTC, the significant NCIS presence for the 5 November 2013 interview, and the fact that the 5 November interview was recorded indicate the agents believed that the appellant was a suspect. The record indicates the VTC was organized to assist SA AB (who was the sole agent at NAS Meridian) with an unresolved death investigation and that the agents believed, in light of Ms. SS's threats to contact the media and government officials, that their efforts would be highly scrutinized. As

---

[30] PE 10 at 1-2.

a result, the NCIS agents wanted to be as transparent and as thorough as possible. Further, the fact that the appellant was facing administrative separation in November provided incentive to resolve the death the investigation before he was discharged.

Accordingly, while recognizing the "relatively low quantum of evidence" needed before deeming a servicemember a suspect who must receive a rights advisement, *Swift,* 53 M.J. at 447, we do not find that a reasonable person would have considered the appellant a "suspect under the totality of the circumstances" of this case. *Muirhead*, 51 M.J. at 96. Accordingly, the appellant was not entitled to a rights advisement until 1317 on 5 November 2013, when the military judge properly ruled that the agents reasonably should have viewed the appellant as a suspect. Moreover, even if we were to assume the military judge erred in concluding the appellant was not a suspect during the first several hours of the interview, we find such error harmless. First, prior to the point in the interview when the military judge deemed the agents should have provided a rights advisement, the appellant had made no admissions. Second, in partially granting the suppression motion, the military judge excluded the appellant's admissions made prior to his actual rights advisement. Thus, taken together, we find that had error occurred, it would have been harmless beyond a reasonable doubt. *See United States v. Brisbane*, 63 M.J. 106, 107, 116 (C.A.A.F. 2006) (finding admission of the appellant's statements "harmless beyond a reasonable doubt" even though he had been "entitled to a rights advisement" that had not been administered, because after later receiving a rights warning, the appellant provided "more detailed statements describing his conduct").

## II. Whether the appellant's statements made after rights advisements should have been suppressed

At trial, the appellant moved to suppress his 5 and 6 November 2013 verbal and written statements made following his Article 31(b) rights advisement as involuntary. The defense argued that agents used coercive interrogation techniques that took advantage of a highly emotional appellant whose low intelligence and compliant nature made him susceptible to the agents' questions and their suggested answers. They further argued that he was unaware of the criminal nature of his interrogation and that the circumstances of the interview/interrogations involving several agents, spanning two days, ending with a polygraph examination, amounted to coercion.

The defense also averred that SA AB, Inv. MS, and SA JH, when providing the appellant his Article 31(b) rights, did not give him cleansing warnings or otherwise explain his prior statements could not be used against him. Further, he now alleges SA AB and Inv. MS used his pre-rights advisement statements to coerce him into making further admissions after he waived his rights. In particular, in addition to exploiting his admission that he rinsed Heather's drinking cup, the appellant claims that the agents used his statement—that he did not assist his wife after learning she had taken approximately 50 hydrocodone pills—"to push [the appellant] towards further admissions even after SA [AB] provided him with rights advisement."[31] The appellant also cites other statements he made before rights advisement that he construes as motive-related admissions (*e.g.,* the appellant's maintaining some nominal contact with his old girlfriend while

---

[31] Appellant's Brief at 49.

still married to Heather and the appellant's statement to Ms. MB in the weeks after Heather's death indicating he was aware she had life insurance).

In response, the Government, both at trial and on appeal, argued the evidence shows the appellant knowingly, intelligently, and voluntarily waived his rights and that his statements were, by a preponderance of the evidence, voluntary under the totality of the circumstances. They further assert the appellant was aware of the criminal nature of the interrogation because he knew he murdered his wife and made several comments during the interview/interrogation indicating he understood the agents' role in the investigation.

## ANALYSIS

In relevant part, MILITARY RULE OF EVIDENCE 304(a)-(b), SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES, MILITARY RULES OF EVIDENCE (2012 ed.) states, "an involuntary statement from the accused, or any evidence derived therefrom, is inadmissible at trial . . . unless the military judge finds by a preponderance of the evidence that . . . the statement was made voluntarily[.]"  "A confession that follows an earlier confession obtained due to actual coercion, duress, or unlawful inducement is presumptively tainted." *United States v. Benner*, 57 M.J. 210, 213 (C.A.A.F. 2002) (citing *United States v. Ford*, 51 M.J. 445, 450-51 (C.A.A.F. 1999) (citing *United States v. Phillips*, 32 M.J. 76, 79 (C.M.A. 1991), and applying the analysis in *Oregon v. Elstad*, 470 U.S. 298 (1985)).  However, "[o]nly those statements that are 'actually coerced' require application of the more stringent test generally described in Military Rule of Evidence 304(b)(3)[.]"  *United States v. Cuento*, 60 M.J. 106, 109 (C.A.A.F. 2004).  If, on the other hand, the earlier confession was involuntary "'only because the suspect had not been properly warned of his panoply of rights to silence and to counsel, the voluntariness of the second confession is determined by the totality of the circumstances.'"  *Id*. (quoting *Phillips*, 32 M.J. at 79); *see also United States v. Cummings,* No. 201000623, 2011 CCA LEXIS 610, at *6, unpublished op. (N.M.Ct.Crim.App. 30 Aug. 2011) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)) ("We assess the totality of the circumstances surrounding the making of the statement when determining voluntariness.").  "'The earlier, unwarned statement is a factor in this total picture, but it does not presumptively taint the subsequent confession.'"  *Cuento,* M.J. 60 at 109 (quoting *Phillips*, 32 M.J. at 79).  *See also Benner*, 57 M.J at 213.  The essence of the inquiry is "whether the confession is the product of an essentially free and unconstrained choice by its maker."  *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F. 1996).  Factors we consider in determining whether a confession is voluntary include: "the condition of the accused, his health, age, education, and intelligence; the character of the detention, including the conditions of the questioning and rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions."  *United States v. Ellis*, 57 M.J. 375, 379 (C.A.A.F. 2002).

We again "apply a clearly-erroneous standard of review to findings of fact and a *de novo* standard to conclusions of law."  *United States v. Norris*, 55 M.J. 209, 215 (C.A.A.F. 2001) (citations omitted).  The voluntariness of a confession is a question of law reviewed *de novo*. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008).  Before analyzing the military judge's conclusions of law and ultimate decision to admit the appellant's statements, we first assess the military judge's findings of fact applicable to this issue.   A "military judge abuses his discretion if his findings of fact are clearly erroneous[.]"  *Ayala*, 43 M.J. at 298.

11

In reviewing the military judge's findings of fact for an abuse of discretion, we find them deficient only in regards to failing to identify all the appellant's pre-rights advisement admissions. An "'[a]dmission' means a self-incriminating statement falling short of an acknowledgment of guilt, even if it was intended by its maker to be exculpatory." MIL. R. EVID. 304(a)(1)(C). In certain circumstances, a failure to act could constitute the offense of negligent homicide. Indeed, two of the five elements under negligent homicide are that a "death resulted from the . . . failure to act of the accused" and that the "failure to act of the accused which caused the death amounted to simple negligence[.]" MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶84(b).

The military judge found "[t]he only admission provided by the accused prior to his rights advisement that was different from…his statement from 19 January 2013, was that he explained that he had rinsed the camouflage cup[.]"[32] We, however, find the appellant made a *second* admission when he stated he was aware Heather had significantly overmedicated herself with hydrocodone and that he took no action to assist her. Specifically, the record reveals that some ten minutes *after* the time the military judge deemed the appellant entitled to Article 31(b) rights advisement, SA AB asked the appellant how many hydrocodone pills were left when he came home from work. His responses indicated only ten pills remained from a 60-pill prescription that was filled the day prior, prompting SA AB to ask, "did the alarm not go off in your head, where the hell have all these pills gone?"[33] The appellant indicated he took no action other than to hide the bottle from his wife. SA AB immediately departed the interview room, retrieved a rights advisement form, and advised the appellant that she suspected him of negligent homicide and other offenses. The agents thereafter referred to the appellant's failure to call 911 several times during the remainder of the interrogation.[34]

Under the circumstances of this case, and in light of the agents' use of this information during their interrogation, we find the military judge's finding of fact limiting his analysis to one admission (cleaning the cup) and not including the second admission (failing to assist his wife upon learning she had taken a significant drug overdose), was clearly erroneous. *Ayala*, 43 M.J. at 298. Nevertheless, although the military judge failed to recognize this second admission in his findings, we find the error harmless and will address it, *infra*, after we examine his ruling on whether the appellant's post-advisement statement should have been suppressed.[35] In all other respects, we adopt the military judge's findings of fact on this issue as our own.

We must now assess whether the appellant's pre-rights advisement statements were obtained as a result of actual coercion, duress, or unlawful inducement. If they were not so

---

[32] AE LVII at 10.

[33] PE 16, Disc 3 at 13:31:05.

[34] *See id.* at Disc 3 at 13:52:47, 14:13:40, 14:20;07, and 14:29:50.

[35] We also find the evidence does not support the appellant's claim that his other pre-rights verbal statements that he had some contact with Ms. MB while married and that he told Ms. MB about Heather's life insurance within weeks of her death were admissions. We find nothing in the context of those statement--made when neither the military judge nor this court considered the appellant a suspect--that would cause the agents to consider them incriminating.

obtained, then we must determine whether the appellant's post-rights statements were voluntary under the totality of the circumstances.

In the exercise of our *de novo* review, we find the military judge correctly concluded the pre-rights advisement statements were not obtained as a result of actual coercion, duress, or unlawful inducement. Although the appellant's initial admissions—that he rinsed the cup and failed to seek help upon learning of his wife's overdose—were made during a technical violation of Article 31(b), we find, as discussed *supra*, that the agents did not reasonably suspect the appellant of an offense until some five hours into the interview. Moreover, as confirmed in the military judge's findings of fact and our own review of the record, the agents' questioning began during regular work hours, with no apparent indication the appellant was tired or suffered from lack of sleep. The agents carefully explained why they needed to speak with him, never raised their voices, never threatened him, nor did they ever make any promises or provide any assurances of leniency or other benefit in exchange for his cooperation. The agents offered him water, they repeatedly asked him if he needed a break, and the interview actually stopped for more than an hour when the appellant left for an unsupervised lunch. Taken together, we find no evidence of "coercion, duress, or unlawful inducement" during the appellant's pre-rights advisement interview or during his actual rights waiver. *Benner*, 57 M.J. at 213.

We next examine whether the appellant's post-rights advisement admissions made on 5 and 6 November, as contained in his sworn statements and depicted in video-recordings, were voluntary under the totality of the circumstances. *Phillips*, 32 M.J. at 79. We find that they were.

In the military judge's conclusions of law, he found the prosecution met its burden to establish, by a preponderance of the evidence, that the appellant's statements were voluntary based on a totality of the circumstances. He also found that the appellant's sworn statements were not the product of actual coercion, duress, or inducement and thus were not presumptively tainted. After considering the Article 31(b) rights advice provided to the appellant; the nature of the questioning; the lack of physical punishment or deprivation of sleep; the lack of detention; and the appellant's age, education, and intelligence, the military judge, citing *Ellis*, 57 M.J. at 379, found the appellant's waiver of his rights was knowing and voluntary. In reaching this conclusion, the military judge found the duration of interview/interrogation was not overly onerous; that all the questioning occurred during normal work hours; that the appellant was offered water, regular breaks, and lunch; and that the appellant freely returned to his barracks overnight. The military judge found the video recording revealed the appellant read and understood his rights without pressure or stress, and he appeared engaged and responsive throughout the questioning.

We find the military judge's conclusions of law are supported by both the record and his findings of fact.

In assessing the totality of the circumstances to determine the voluntariness of the appellant's confessions, we consider the holdings of our higher court in analogous cases where service members made initial unwarned statements that investigators relied upon in a subsequent interrogation following Article 31 rights advisement. *United States v. Norfleet*, 36 M.J. 129, 130-32 (C.M.A. 1992) (holding that a statement made by the appellant to investigators who had

13

advised him of his rights, and who had exerted no coercion, was voluntary, even though those investigators were aware of an unwarned statement made 12 days earlier by the appellant,); *Cuento*, 60 M.J. at 109-10 (holding that following a coerced initial statement, a subsequent post-rights advisement statement made seven days later to an NCIS investigator not involved in the initial civilian investigation was voluntary, for a 37-year old accused who was not in custody, and who was "oriented to his surroundings" by the agent); *Brisbane*, 63 M.J. at 115 (holding that when a counselor acting in furtherance of an investigation failed to provide initial rights advisement, and a subsequent post-rights statement was made to an investigator without cleansing warnings, the subsequent warned statements were voluntary and admissible in the absence of coercive or inhumane questioning). Finally, we note that although the appellant was not provided "cleansing warnings,"[36] such warnings are not a prerequisite to admissibility, and a failure to provide such warnings is only one of many factors used in assessing voluntariness under the "totality of the circumstances." *United States v. Lichtenhan*, 40 M.J. 466, 469-70 (C.M.A. 1994).

In analyzing this case, we recognize our "consideration of the totality of the circumstances, however, is not merely an exercise in counting how many factors weigh on each side of the issue, for all factors are not evenly weighted under all circumstances." *Phillips*, 32 M.J. at 80. We must "discern whether the circumstances as a whole satisfy us that [the appellant's] admissions . . . were made voluntarily." *Id*. Because the circumstances leading to the appellant's confessions do not precisely mirror the above-cited cases, we next detail the factors we consider relevant to our determination that the admissions were voluntary.

When the agents realized the appellant was a suspect, they clearly educated him on his Article 31(b) rights by reading those rights to him as he read along, asking him to initial his understanding on the rights advisement form, and then asking him to read the right waiver portion aloud. Only then did he waive his rights. Importantly, he was again reminded of his rights mid-afternoon on 5 November when SA AB added murder as a suspected offense on his rights advisement form. Under these circumstances, there can be little doubt the appellant understood he was under no obligation to continue speaking with the agents and that his decision to do so was a voluntary one.

The record reveals the post-rights advisement portions of the interrogation proceeded in similar fashion to the pre-rights advisement phase. Although the agents did challenge the appellant on inconsistencies in his statements and appealed to his sense of guilt, the video record clearly shows they did not raise their voices, seek to intimidate him, or use coercive tactics. They continued to give him breaks, offered him water, gave him time to regain his composure, at times attempted to give him comfort, and brought him dinner.

---

[36] We struggle to discern when the agents could have appropriately provided cleansing warnings. They did not consider the appellant a suspect until they actually read him his rights (when they learned of his inaction after he became aware Heather had overdosed) and it would be ten months before a military judge would determine his unwarned statements actually existed and a technical violation of Article 31(b) had occurred. Fortunately, the agents ameliorated the situation by their repeated clear and unequivocal explanations of the appellant's rights before he rendered a full confession.

During the evening of 5 November, after a 65-minute break, the appellant carefully reviewed his NCIS-typed confession, taking more than four minutes to read it. He then swore to its truth on pain of perjury. Concerned for the appellant's well-being overnight, the agents arranged for his master chief to spend the evening with him. The master chief refrained from discussing the case but had dinner with the appellant, watched television with him, and provided emotional support before the appellant returned to his barracks room to sleep the remainder of the night. During this substantial overnight break, the appellant certainly had the opportunity to consider the day's events, and to evaluate whether he should continue with the interview.

The following morning, the master chief, again driving his personal vehicle, picked up the appellant, who said he slept for a full eight hours, got breakfast with him, and relaxed and watched television with appellant, before taking him back to the NCIS office. Once there, the appellant was yet again advised of his Article 31(b) rights and again waived them before beginning his pre-interview with SA JH. Following what amounted to only two and a half hours of questioning, the appellant fully confessed to the murder. That confession was then reduced to a written sworn statement.

Notwithstanding defense evidence presented on the appellant's suggestible nature or below average intelligence, the appellant was, at the time of the interview, a 30-year-old Sailor, who had previously attained the grade of Petty Officer Third Class and "missed the E-5 test" by one point.[37] As a high school graduate, former emergency medical technician, and average Sailor, he certainly possessed the capacity to knowingly and voluntarily incriminate himself. The video record from both days supports his intellectual capacity and his full cognizance of the agents' role and the purpose behind the questioning. As noted in the military judge's findings of fact, the appellant's telling comment to himself, made during the break and before murder was added as a suspected offense, that he did not "want to go to jail but I am,"[38] demonstrates he fully knew what was at stake when he chose to answer the agent's questions.

We have considered but reject the appellant's argument that he was unaware of the criminal nature of his interrogation; that his relatively low intelligence and susceptibility to authority overrode his free and unconstrained decision making; that the character and conditions of his non-custodial interrogation rendered his statements involuntary; and that he was subject to coercive interrogation techniques.[39]

A notable factor distinguishing the appellant's case from the analogous cases cited *supra* is the video showing with absolute clarity the 5 November interview and interrogation. The unfiltered video reveals a tearful, intensely unhappy appellant attempting to minimize his criminal role in his wife's death while struggling to alleviate his remorse and guilt. For example, during his 5 November interview, SA AB told the appellant she believed he was "getting a

---

[37] PE 6, Disc 1 at 19:52:35.

[38] AE LVII at 6*;* PE 6, Disc 3 at 15:52:50.

[39] In so holding, we note the appellant was permitted to present evidence and argument to the fact finder on all these areas, including testimony from an expert in forensic psychology, an expert in clinical social work and grief counseling, and an expert in homicide investigations and law enforcement interrogations and false confessions. *See*, Record at 1313, 1360,1428.

burden lifted," to which he replied, "Yes, I want to, I want to" while nodding his head.[40]  Later, Inv. MS told him, "you can unburden your soul," to which the appellant vigorously nodded in agreement. [41]  And, later still, Inv. MS told him, "you are the only one who can help us with [finding out exactly what happened to Heather], and you need to have it too…am I right?"  The appellant responded by saying, "yes" while nodding his head.[42]  Lastly, sitting alone in the interview room shortly after confessing to his wife's murder, the appellant said, "the truth shall set you free."[43]

The appellant was also recorded as he read aloud his entire 6 November confession, which provided additional detail on his efforts to kill his wife (secretly giving her 30 pills instead of two) and clarified financial gain as an additional motive.  On the video, he adopted his statement, agreed that he had been offered breaks and lunch, and affirmed his statement was true and not coerced.  The video reveals the appellant was alert, engaged, and had little difficultly reading his statement.

"When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Elstad*, 470 U.S. at 312.  Under the circumstances of this case, we find the appellant's confessions voluntary and thus appropriately considered by the members.

Our holdings moot the appellant's final issue contained within his assignment of error, and we need not consider whether we should take action in this case to deter future violations of the Constitution.  We find no Constitutional violations occurred.

## CONCLUSION

The findings and the sentence are affirmed.

Chief Judge BRUBAKER and Judge MARKS concur.

For the Court



R.H. TROIDL
Clerk of Court

---

[40] PE 16, Disc 3 at 13:35:45.

[41] *Id*. at 14:33:30.

[42] *Id.*, Disc 4 at 15:09:40.

[43] *Id.*, Disc 6 at 18:57:33.