UNITED STATES, Appellee,

v.

Private First Class Michael J. WARREN,
United States Army, Appellant.

ARMY 9501223.

U.S. Army Court of Criminal Appeals.

16 Dec. 1997.

For Appellant: Major Leslie A. Nepper, JA; Captain Mark A. Bridges, JA (on brief).

For Appellee: Colonel John M. Smith, JA; Lieutenant Colonel Eva M. Novak, JA; Captain Robert F. Resnick, JA (on brief).

Before TOOMEY, TRANT, and CARTER, Appellate Military Judges.

## OPINION OF THE COURT

CARTER, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of indecent exposure and kidnapping in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (1988) [hereinafter UCMJ]. The court-martial members found the appellant not guilty of indecent assault and indecent acts. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for one year, and reduction to Private E1.

This case is before the court for review under Article 66, UCMJ, 10 U.S.C.A. § 866. In his assignment of error, appellant asserts that the military judge erred by admitting into evidence appellant's written statement to Sergeant (SGT) Schultz, a military police investigator (MPI). We disagree.

## FACTS

On 15 April 1995, appellant offered an eighteen-year-old German woman (Ms. R) a ride in his black BMW automobile from the downtown Marktplatz in Schweinfurt, Germany, to a nearby U.S. Army kaserne. Ms. R placed two bags in the back seat of appellant's car and then got in the front seat. She became worried when appellant drove on the autobahn in the opposite direction of the kaserne. Appellant asked Ms. R if she knew what "masturbation" meant. Ms. R opened her door to escape from the moving car. Appellant stopped the car and Ms. R jumped out, leaving her bags in the back seat.

Someone gave Ms. R a ride to her boyfriend's barracks. Ms. R's boyfriend called the military police station at 1915 hours and reported the incident to SGT Bougard, the desk sergeant. The boyfriend described the driver and stated that the driver picked up Ms. R at the Schweinfurt downtown Marktplatz in a black, four-door BMW. The boyfriend further stated that the driver had Ms. R's bags. While SGT Bougard was talking to the boyfriend on the telephone, the appellant walked into the military police (MP) station at 1919 hours with two bags. This was all happening during an MP station shift change. The incoming desk sergeant, SGT Woodhams, saw that SGT Bougard was talking on the telephone and asked the appellant, "May I help you?" Appellant replied that he wanted to talk in private. Sergeant Woodhams told the appellant that if he wanted to talk about anything criminal he would have to get an investigator to talk to him. Appellant told SGT Woodhams that it was not anything like that. Sergeant Woodhams led the appellant to a nearby room. Appellant told SGT Woodhams that he picked up a hitchhiker in the Schweinfurt downtown Marktplatz area; that she freaked out and tried to jump out of his moving car; that he stopped and let her out along side the autobahn; that she left her bags in his car; and that he wanted to turn the bags over to the police. Sergeant Woodhams gave appellant an "interview worksheet" form to fill out his personal data: name, unit, social security number, etc.

Meanwhile, SGT Bougard told Ms. R's boyfriend to bring her to the military police station to make a statement. Sergeant Bougard also called MPI Schultz to the station. Sergeant Woodhams went back to the desk and told SGT Bougard what the appellant had said. Sergeant Bougard sent SGT Woodhams to the parking lot to look for a black BMW. Sergeant Woodhams returned with the license plate number of a black BMW. A registration check of the license number indicated that the black BMW was registered to the appellant.

When MPI Schultz arrived at 1935 hours, SGT Bougard briefed him on all the information that they had and told him "things are just a little too close, you know, ... things start to fit a little too much. You know, there's too many coincidences." Investigator Schultz testified that at 1935 hours he "made

the connection" between the boyfriend's telephone complaint and the soldier at the station, but that he "did not believe we had anything to suspect him of at that time."

Investigator Schultz instructed SGT Bougard and Corporal (CPL) Vincelli, a patrol supervisor who was just reporting for duty, to take a statement from the appellant concerning why he came into the MP station. A patrolman told appellant to write a statement concerning how he got the bags and left him alone to draft it. Appellant was not given a rights warning.

After reviewing appellant's narrative statement, CPL Vincelli asked him several clarification questions concerning street locations and the contents of the bags and returned the statement to SGT Woodhams (who had now assumed duty as desk sergeant) for review. After coordination with MPI Schultz, CPL Vincelli was instructed to "close out the statement" which means ask one final question: "Do you wish to add anything to this statement?" When asked this question, appellant wrote, "I also, after she got in my car, propositioned her for sex." Corporal Vincelli again took the statement to the desk sergeant and MPI Schultz for review. Corporal Vincelli testified that MPI Schultz told him, "There's nothing wrong with that" and directed him to ask the question, "Elaborate on your proposition." In response to that question, appellant wrote, in part, "I did show her a part of my body." Corporal Vincelli testified that he again coordinated with MPI Schultz, who instructed him to terminate the interview.

Investigator Schultz testified that he then introduced himself to the appellant, told him that there were allegations being made against him, that he wanted to talk to him but would have to read him his rights first, and that he would do that as soon as he could. (Investigator Schultz was also working a drunk driving case that had just occurred involving the community sergeant major.) The appellant was taken to a holding area and guarded by CPL Vincelli. Investigator Schultz and the interpreter then interviewed Ms. R who made a written statement.

After the victim's statement was translated, MPI Schultz interviewed the appellant as a suspect. Investigator Schultz executed a proper rights advisement, but did not give appellant any cleansing rights advisement concerning his first statement. Investigator Schultz testified that he used both the victim's statement and appellant's first statement when he took the second statement. Appellant testified that he would not have signed the rights waiver if MPI Schultz had not had his first statement.

The written statement that MPI Schultz took from the appellant generally restated what he orally told SGT Woodhams. Appellant also admitted in his statement that he pulled down his shorts, exposed his penis to Ms. R, and asked her if this was what she wanted and would she mind if he masturbated. Appellant also stated in his second statement that he intentionally drove away from the kaserne; that he asked the girl to have sex with him; that he did not grab her between her legs or touch her in any way; that he did not know if she saw his penis; and that he did not masturbate while the girl was in the car.

The military judge ruled that the appellant did not become a suspect until his answer closing out the first statement, "I also, after she got in my car, propositioned her for sex." The military judge suppressed the "elaborate on your proposition" question and appellant's, "I did show her a part of my body," response thereto, but otherwise found the remainder of appellant's handwritten statement and all of his sworn statement to MPI Schultz admissible.

The military judge concluded, considering the totality of the circumstances surrounding its taking, that appellant's sworn statement to MPI Schultz was voluntary, finding:

1. There was no coercion, duress, intimidation, or promises made to appellant.

2. Appellant was properly advised of his rights and voluntarily waived them.

3. Appellant rendered, reviewed, and corrected a sworn statement.

4. Although appellant's first statement would have been helpful to MPI Schultz in examining the appellant, the translated victim's statement was much more helpful. The

portion of appellant's first statement that was suppressed "would not have been of great assistance to Investigator Schultz in the conduct of his interview with the accused."

5. Appellant's interview with MPI Schultz lasted only about one hour.

6. Appellant had at least three hours after being told by MPI Schultz that he would have to remain and be read his rights before any further questioning. "[T]his should have given the accused ample opportunity to reflect on the serious nature of the matters in which he was about to be questioned."

7. Appellant was allowed to call his wife twice to say he was okay and to stop calling the MP station.

## DISCUSSION

Appellant's request for relief is based upon three arguments.

■■■ First, appellant asserts that he should have been read his rights at 1935 hours. Spontaneous statements, even if possibly incriminating, are not protected by Article 31, UCMJ, 10 U.S.C.A. § 831. *United States v. Lichtenhan*, 40 M.J. 466, 469 (C.M.A.1994) citing *United States v. Vitale*, 34 M.J. 210, 212 (C.M.A.1992). Military police have no duty to interrupt a confession to read a potential suspect his rights if the police are not questioning him. Appellant voluntarily entered the police station and sought assistance regarding disposition of the victim's two bags. Appellant was left alone to write a narrative statement of how he obtained the two bags that he wished to turn over to the military police. The "interrogation" began when the military police asked appellant to "elaborate" on his closing response, "I propositioned her for sex." *See Lichtenhan*, 40 M.J. at 469; Military Rule of Evidence 305(b)(2) [hereinafter Mil.R.Evid.] (" 'Interrogation' includes any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning."). We find that the military judge correctly ruled that rights warnings were not required at 1935 hours.

Second, appellant argues that the military police used illegal tactics that amounted to coercion. Specifically, appellant alleges that he was deprived of food, drink, sleep, and warm clothing for over three hours while waiting to be interviewed. The record facts, which we need not describe here, simply do not substantiate appellant's claim of coercion.

■■■ Finally, appellant argues that his second statement was involuntary and tainted by the first statement. We do not apply a presumptive taint analysis because the inadmissible portion of appellant's first statement was involuntary only because it was unwarned, not as a result of any actual coercion. Instead, the voluntariness of appellant's second statement is determined by examining the totality of the circumstances surrounding its taking. *Lichtenhan*, 40 M.J. at 470, citing *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985) and *United States v. Phillips*, 32 M.J. 76 (C.M.A.1991). The government must prove by a preponderance of the evidence that appellant's statement was voluntary. Mil.R.Evid. 304(b)(3) and (e)(3).

■■■ We review a military judge's findings of fact on a motion to suppress under a clearly erroneous standard and his conclusions of law under a de novo standard. *United States v. Ayala*, 43 M.J. 296, 298 (1995). Thus, the military judge in this case abused his discretion by admitting appellant's statement only if the judge's findings of fact were clearly erroneous or his conclusions of law were incorrect.

The record supports the military judge's findings of fact and his conclusion that appellant's sworn statement was voluntary considering the totality of the circumstances surrounding its taking. On the other hand, we find appellant's own testimony, that he would not have waived his rights if MPI Schultz had not had his first statement, not credible. Appellant's general aptitude score was 128. Most of his specific aptitude scores were between 131 and 137. This very intelligent soldier voluntarily came to the police station to turn in the victim's bags immediately after the incident. The vast majority of his first statement was spontaneous, including how he picked up the victim and came into posses-

sion of her bags and that he propositioned her for sex.

Appellant executed a valid rights waiver prior to the second statement. The police did not use any coercive tactics to obtain the second statement. Under such circumstances, the subsequent rights warning and waiver eliminates any derivative taint from the inadmissible portion of the first statement, unless the second statement is otherwise shown to be involuntary.

The victim's statement, which was taken between appellant's two statements, substantially matched appellant's second statement, except that she did not state that he exposed his penis. However, her description of appellant's masturbating motions would have inevitably lead MPI Schultz to question appellant regarding what he was doing with his penis. We find no derivative taint under these circumstances.

In summary, the simple fact is that this appellant was anxious to tell his story. *See Lichtenhan*, 40 M.J. at 470. Applying a preponderance of the evidence standard to the voluntariness of appellant's sworn statement, and, considering the totality of the circumstances, we do not find that the military judge's findings of fact were clearly erroneous or that his conclusions of law were incorrect.

We have reviewed the matters raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them to be without merit. The findings of guilty and the sentence are affirmed.

Senior Judge TOOMEY and Judge TRANT concur.