*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

**UNITED STATES**
Appellee

**v.**

**Joshua D. LEWIS, Specialist**
United States Army, Appellant

**No. 19-0109**

Crim. App. No. 20180260

Argued March 27, 2019—Decided May 30, 2019

Military Judge: Douglas K. Watkins

For Appellant: *Captain Benjamin J. Wetherell* (argued); *Lieutenant Colonel Tiffany D. Pond*, *Major Jack D. Einhorn*, and *Captain Benjamin A. Accinelli*.

For Appellee: *Captain Allison L. Rowley* (argued); *Colonel Steven P. Haight, Lieutenant Colonel Eric K. Stafford*, and *Captain Catharine M. Parnell*.

Chief Judge STUCKY delivered the opinion of the Court, in which Judges OHLSON, SPARKS, and MAGGS, joined. Judge RYAN filed a separate concurring opinion.

————————

Chief Judge STUCKY delivered the opinion of the Court.

During the course of three separate interviews with three different law enforcement officers assigned to the Fort Hood Criminal Investigation Command (CID), Appellant made a series of damaging admissions. The military judge found that the statements were made involuntarily and suppressed all three statements. We granted review to determine whether the military judge abused his discretion in suppressing Appellant's third statement to law enforcement. We hold that he did. Accordingly, we affirm the judgment of the United States Army Court of Criminal Appeals (CCA).

## I. Posture

Appellant faces two charges arising from the sexual assault of ZC, a child between the ages of twelve and fifteen. On February 9, 2018, the convening authority referred one

specification of sexual assault of a child against Appellant, and, in the alternative, referred one specification of sexual assault. Articles 120b and 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920b, 920 (2012).[1]

This case comes to us as an interlocutory appeal. On April 30, 2018, the military judge suppressed three incriminating statements Appellant made to CID as well as all evidence derived therefrom on the grounds that the statements were made involuntarily under Military Rule of Evidence (M.R.E.) 304.

The Government quickly moved for reconsideration as to Appellant's second and third statements (as well as their derivative evidence) but did not seek reconsideration of the military judge's decision to suppress Appellant's first statement. After considering the Government's request for reconsideration, the military judge reversed his ruling suppressing the derivative evidence but upheld his ruling suppressing the second and third statements.

In an Article 62, UCMJ, 10 U.S.C. § 862 (2012), appeal, the Government sought relief at the CCA but again did not challenge the military judge's decision to suppress Appellant's first statement to CID. In a published opinion, the CCA affirmed in part and reversed in part, and held that the military judge did not err in suppressing Appellant's second statement but did err in suppressing Appellant's third statement. *United States v. Lewis*, 78 M.J. 602, 618 (A. Ct. Crim. App. 2018). The CCA ordered the record returned to the military judge for action not inconsistent with its opinion. *Id.* Before us, Appellant seeks reversal of the CCA's conclusion that the third statement is admissible.[2]

---

[1] The only difference between the theories of liability is the age of the victim.

[2] In *United States v. Lopez de Victoria*, a case in which an accused appealed an adverse Article 62, UCMJ, ruling to this Court, we held that "cases appealed under Article 62, UCMJ, may be reviewed under Article 67(a), UCMJ." 66 M.J. 67, 71 (C.A.A.F. 2008).

## II. Background

Because the factual circumstances of Appellant's alleged offenses are not relevant to the inquiry before us, we need not engage in a lengthy recitation of the underlying facts. Instead, we focus solely on the circumstances surrounding Appellant's three statements to law enforcement.

As a preliminary matter, we seek to emphasize that our review concerns only Appellant's third statement to law enforcement—a confession made to a polygrapher, Special Agent (SA) Boettger. As noted above, Appellant's first two statements were suppressed and are not challenged before us. As such, "the legal issues presented to this [C]ourt are narrower than the whole story may otherwise suggest. While we limit our holding to the issue[] properly presented, we provide a broader factual picture for context." *Lewis*, 78 M.J. at 606. This is because "it is clear from the military judge's ruling that his suppression of the … third statement[] is related to police conduct during the first." *Id.*

### A. The First Interrogation

On May 15, 2017, four days after an "unknown female" reported to a Fort Hood Charge of Quarters (CQ) desk that Appellant had inappropriately touched her daughter, a non-commissioned officer escorted Appellant to the Fort Hood CID office. The military judge found that, "[p]er CID Standard Operating Procedure (SOP), the accused's personal belongings were taken from him, to include his cell phone, and secured in a locker at CID. He was also searched for officer safety."

Investigator (INV) Lizivette Delgado,[3] a law enforcement agent on loan to CID from the Military Police (MP), interrogated Appellant. At the time, CID actively suspected Appellant of inappropriately touching the "unknown female's" daughter.

The military judge found that because INV Delgado wanted to get the accused's story and feared that Appellant

---

[3] INV Lizivette Delgado has since changed her last name. Because she was INV Delgado at all relevant times, we refer to her as such.

might invoke his Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2012), rights if she brought them to his attention, she purposely elected not to inform him of them prior to commencing the interrogation. Instead, prior to any rights waiver, INV Delgado asked Appellant a series of questions designed to obtain Appellant's "story" as well as elicit information as to the identity and contact information of the "unknown female." For example, INV Delgado asked, "Real quick, I had a crazy lady come in and report something, I don't know who she is, she mentioned something about a daughter, so do you happen to know someone whose mom is crazy?" 78 M.J. at 607. In response, Appellant identified MW, the woman who made the report and the mother of the alleged victim, ZC.

> The accused then asked [INV Delgado], "What's going on?" [INV Delgado] responded, "Well you mentioned the name right off the bat." The accused then stated he was just trying to get accurate information because he thought he and the woman had settled the situation. The investigator asked, "Is there a situation?" The accused responded, "They thought something happened between me and their daughter."
>
> The investigator returned to asking the accused about biographical data, but then asked the accused, "Do you want to tell me about the story?"

78 M.J. at 607.

In response, Appellant admitted that he had touched ZC's leg one night, making her uncomfortable.

Only after INV Delgado had elicited this information did she decide to advise Appellant of his rights. During a break, INV Delgado sought advice from other CID personnel as to whether she should provide a cleansing statement[4] to Appellant. The agents decided she should not give a cleansing statement, and INV Delgado accordingly did not give one.

When the interrogation resumed, INV Delgado returned to gathering biographical information, and eventually stated, "[y]ou mentioned a story, and I didn't ask any questions.

---

[4] A "cleansing" statement advises a suspect that the contents of previous unwarned statements may not be used against him. *United States v. Phillips*, 32 M.J. 76, 78 (C.M.A. 1991).

I'm not allowed to ask questions, until I advise you of your rights, so we can go through that first, and then you'll tell me your story again." 78 M.J. at 607 (emphasis omitted).

Only then did she: (1) advise Appellant that he was a suspect; and (2) inform him of his Article 31(b), UCMJ, rights. After Appellant waived his rights, Appellant was questioned for approximately forty minutes, and he again admitted that he touched ZC's leg when she was fifteen years old.

### B. The Second Interrogation

Exactly one month later, on June 15, 2017, Appellant was again escorted to CID for interrogation. This time, SA Singh, a CID agent, interrogated Appellant. Appellant was immediately advised of his rights, which he waived.

> The military judge found that this second exchange consisted primarily of open ended questions, asked by an agent in a "calm voice and demeanor throughout." Throughout the interview, "the accused was cooperative and inquisitive." The agent did not ask about vaginal penetration, but instead asked "what story [he] had heard regarding the victim." The accused responded that he heard he had "fingered her."

78 M.J. at 608.

### C. The Third Interrogation

Appellant's third and final interrogation was conducted by SA Boettger on July 11, 2017. Appellant again waived his rights.

> Initially the accused was talkative and inquisitive. However, when the polygrapher asked about whether the accused had vaginally penetrated Miss ZC, the accused became "overwhelmingly sad and then admitted to penetrating Miss ZC's vagina with his finger after she had told him no." He stated he had done this in an attempt to convince Miss ZC to have sex with him. From the record, it appears that appellant's statements were made before the administration of the polygraph and that the "instrumentation" part of the polygraph was never conducted.

78 M.J. at 608.

### D. The Military Judge's Rulings

As noted above, the military judge suppressed all three of Appellant's statements as well as all derivative evidence, including the identity of the victim and any testimony she might have offered, on the grounds that the Government failed to prove that Appellant's statements were given voluntarily. The Government sought reconsideration and presented evidence that normal investigative efforts would have allowed a CID agent without knowledge of Appellant's statements to identify ZC. In light of this evidence, the military judge found that the doctrine of inevitable discovery applied to the identities of ZC and her mother, but continued to suppress Appellant's statements to CID.

In making his ruling, the military judge, in relevant part, made the following factual findings and conclusions of law:

Appellant was a junior enlisted soldier in his early twenties with a high school education and six years of military service. He had a General Technical (GT) score of 92 and possessed "low average or below average intelligence." 78 M.J. at 609. While a score of 83 is required to enlist, a score of 110 would qualify a candidate for any Army job. The military judge recognized a local recruiter's observation that, in her experience, the average GT score for candidates is between 85 and 102, and that, in her opinion, a 92 is a "dud." "In the field of Army psychology, a GT score of 60 would likely indicate an intellectually [sic] disability. A score of 80 would cause concern to a psychologist."

Appellant had been diagnosed with an adjustment disorder, and even though the diagnosis was made six months after Appellant's final interrogation, the military judge determined that he could reasonably infer that Appellant suffered from adjustment disorder at the time of his interrogations. He found, however, that while adjustment disorder can affect mood and the ability to cope with stressors, it does not generally affect decision-making.

Appellant was in custody at all relevant times during the interrogations, none of which were "of long duration" or involved coercion. While Appellant "may have been allowed to leave if he insisted, a reasonable person of the accused's age, experience, education, diagnoses, and military service would

not have felt he was at liberty to terminate the interrogation and leave." Police misconduct during the first interrogation tainted the second and third interrogations, and "no cleansing statements were given before either subsequent interview." Notwithstanding the fact that Appellant's "*appearance* [wa]s one of willingness and voluntariness," his free will had been overborne and his statements were made involuntarily.

### III. The Law

"In an Article 62, UCMJ, appeal, this court reviews the military judge's decision directly and reviews the evidence in the light most favorable to the party which prevailed at trial," which in this case is Appellant. *United States v. Pugh*, 77 M.J. 1, 3 (C.A.A.F. 2017).

A military judge's decision to exclude evidence is reviewed for an abuse of discretion. *United States v. Jasper*, 72 M.J. 276, 279 (C.A.A.F. 2013). "A military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015) (internal quotation marks omitted) (citation omitted). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted); *see United States v. Criswell*, 78 M.J. 136, 141 (C.A.A.F. 2018).

M.R.E. 304(a) provides that "an involuntary statement from the accused, or any evidence derived therefrom, is inadmissible at trial." A confession is involuntary if it was "obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." M.R.E. 304(a)(1)(A); *see also United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008).

The voluntariness of a confession is a question of law that this Court reviews de novo. *United States v. Bresnahan*, 62 M.J. 137, 141 (C.A.A.F. 2005). "The prosecution bears the burden of establishing by a preponderance of the evidence that the confession was voluntary." *Freeman*, 65 M.J. at 453.

Voluntariness turns on whether an accused's "will has been overborne." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (internal quotation marks omitted) (citation omitted). In the course of our review, "[t]he necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker." *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F. 1996).

> In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Supreme Court distinguished between two classes of "involuntary" statements and between the impact of each on a subsequent interrogation. Where a confession is obtained at a lawful interrogation that comes after an earlier interrogation in which a confession was obtained due to *actual* coercion, duress, or inducement, the subsequent confession is presumptively tainted as the product of the earlier one. On the other hand, where the earlier confession was "involuntary" only because the suspect had not been properly warned of his panoply of rights to silence and to counsel, the voluntariness of the second confession is determined by the totality of the circumstances.

*Phillips*, 32 M.J. at 79; *accord United States v. Gardinier*, 65 M.J. 60, 64 (C.A.A.F. 2007). In this case, we are only concerned with the second class of statements.

> In determining whether a defendant's will was over-borne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

*Freeman,* 65 M.J. at 453 (quoting *Schneckloth*, 412 U.S. at 226) (citations omitted). Other factors include an earlier violation of Article 31(b), *United States v. Byers*, 26 M.J. 132, 135 (C.M.A. 1988), whether the admission was made as a result of the questioner's using earlier, unlawful interrogations, *Phillips*, 32 M.J. at 80–81, and "the presence of a 'cleansing warning,' however, the absence of such is not fatal

to a finding of voluntariness." *United States v. Brisbane*, 63 M.J. 106, 114 (C.A.A.F. 2006) (internal quotation marks omitted) (citation omitted). "The fact that a suspect chooses to speak after being informed of his rights, is of course, highly probative." *Elstad*, 470 U.S. at 318.

## IV. Discussion

With these legal principles in mind, we turn to an analysis of the voluntariness of Appellant's confession to SA Boettger. In assessing voluntariness, we apply the two-part test from *Schneckloth*, 412 U.S. 218, looking to both the personal characteristics of the accused as well as the circumstances of the interrogation. As the military judge noted, "[c]ases such as this are very fact specific."

### A. Characteristics of the Accused

The military judge found that at the time of Appellant's third interrogation, he was a specialist in his early twenties who had served for six years. He had received a high school diploma, and his GT score was 92.

On the record before us, Appellant's relative age and maturity do not raise any serious red flags. It is true that Appellant was an E-4 with "low average or below average intelligence." 78 M.J. at 609. However, many soldiers share those characteristics, and Appellant's GT score was not outside the realm of normalcy. We do not believe that Appellant's status as a junior enlisted soldier with "low average" intelligence necessarily weighs against a finding of voluntariness. Even the military judge acknowledged that Appellant's GT score was anecdotally well within that of the average recruit, and that his GT score would not cause concern to either the Army or a psychologist.

Although it is nearly impossible to find a truly analogous case when conducting such a fact-specific inquiry, we note that, in many ways, Appellant's personal characteristics mirror those of the accused in *Freeman*, a case in which the Court concluded that the characteristics of the accused favored a finding of voluntariness. Like the accused in *Freeman*, Appellant was an E-4 in his early twenties, and there was no evidence that he could not read or write. *Freeman*, 65 M.J. at 454. Like Freeman, Appellant "never complained

about the process, never asked for an attorney, never asked to stop the interview or leave, or in any other way indicated that he felt coerced or pressured into making a statement." *Id.* That said, *Freeman* is not a perfect comparison; there the accused did not raise concerns over "low-average" intelligence or mental impairment. *See id.*

In contrast, in the instant case, the military judge found that Appellant was diagnosed with an adjustment disorder six months after his interview with INV Delgado. The military judge then deemed it reasonable to presume that Appellant was suffering "from adjustment disorder with mixed anxiety and depressed mood" during each of his three interviews. On reconsideration, after the Government presented expert testimony that an adjustment disorder would not affect a person's "ability to make good decisions," the military judge found that Appellant's diagnosis "generally does not affect decision making, but it does affect mood and the ability to cope with additional stressors." The military judge then explicitly found that "[t]he accused was suffering from a psychological disorder that affect[s] his mood and ability to deal with additional stressors" at the time of his interviews.

This finding was clearly erroneous, for there is no evidence that Appellant suffered from the disorder at the time of his interview with SA Boettger. There is simply no temporal tie. As the CCA noted, the type of disorder Appellant was diagnosed with requires symptoms to emerge within three months of an "identifiable stressor." *Lewis*, 78 M.J. at 611 (internal quotation marks omitted) (citation omitted). While a military judge is allowed to draw reasonable inferences from the evidence presented, *see United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019), nothing in the record identifies the "identifiable stressor" that formed the basis of the diagnosis[5] and no expert testimony establishes that Appellant was suffering from the disease at the time of his inter-

---

[5] We note that Appellant's subsequent apprehension and charges could well qualify as "identifiable stressors" that contributed to his diagnosis. While Appellant might have suffered from adjustment disorder at the time of his interrogation with SA Boettger, it is equally likely that Appellant's disorder was brought on by stress related to his interrogations and arrest.

views. In the absence of any such evidence, we conclude that the military judge's inference that Appellant's diagnosis could be retroactively applied was unreasonable and that his finding was clearly erroneous. *See Criswell*, 78 M.J. at 141 ("A finding of fact is clearly erroneous when there is no evidence to support the finding.").

In conducting its analysis, the CCA found that while the military judge's finding was clearly erroneous, it had "minimal impact" due to the military judge's related finding that Appellant's diagnosis generally does not affect decision-making. We disagree. In his analysis, the military judge explicitly highlighted the fact that Appellant had been diagnosed with a psychological disorder and noted that it "affected his mood and ability to deal with additional stressors." He then commented on Appellant's mood change, noting that he "became dejected" right before his ultimate confession. This language makes clear to us that the military judge's erroneous finding played no small role in his ultimate determination of voluntariness.

Furthermore, even assuming Appellant *had* suffered from adjustment disorder at the time of his interview with SA Boettger, "[m]ental illness does not make a statement involuntary per se." *United States v. Mott*, 72 M.J. 319, 330 (C.A.A.F. 2013); *see also Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (deeming voluntary the spontaneous confession of a schizophrenic experiencing command hallucinations).

In the instant case, the record does not reflect that Appellant's adjustment disorder negatively affected his capacity for free choice or that government overreaching occurred at the time of his third interview. Accordingly, no consideration of the mental impairment he suffered at the time of his third interview, if any, is warranted. On the whole, Appellant's characteristics favor a finding of voluntariness.

### B. The Details of the Interrogation

Turning to the character of Appellant's interrogation, we note that when Appellant appeared at the CID office for a polygraph examination on July 11, 2017, SA Boettger advised Appellant of his rights. Appellant acknowledged those rights, waived them, and agreed to answer questions. We

find it "highly probative" that Appellant chose to speak after being informed of his rights. *Elstad*, 470 U.S. at 318.

SA Boettger was not one of the agents who had interrogated Appellant previously, and the questioning was not particularly lengthy. There were no threats, lies, or physical abuse, and Appellant was not denied any material comforts. Appellant readily admitted in his sworn statement that he was allowed to take breaks, not deprived of anything during the interview, and was treated "great" by SA Boettger. In short, there was "no evidence any of the interviews were coercive in nature or under inhumane conditions." The military judge seemingly downplayed this finding in his analysis.

While the military judge made much of the fact that Appellant's latter interrogations were tainted by the first, INV Delgado's circumvention of Article 31(b) is but "one circumstance to be considered along with others in determining whether the statements made by [A]ppellant after receiving a warning were voluntary." *Byers*, 26 M.J. at 135. Despite the problematic nature of Appellant's first interrogation, we cannot lose track of the fact that "[t]he appropriate legal inquiry is … whether [the] subsequent confession was voluntary *considering all the facts and circumstances of the case.*" *United States v. Steward*, 31 M.J. 259, 265 (C.M.A. 1990); *see also Gardinier*, 65 M.J. at 64.

In the instant case, time attenuated the taint of the first interrogation. Although Appellant was not given a cleansing statement to cure the earlier Article 31(b) violation, Appellant's interview with SA Boettger occurred almost two full months after the first interrogation, during which time he was not confined. Appellant had been warned of his right to counsel during the previous interrogations and had several weeks between interviews to seek legal counsel or decide to decline further interviews. He did not do so. Just as in *Brisbane*, Appellant was free to leave after each interview, giving him ample opportunity "to weigh the pros and cons of continuing to talk with military authorities." *Brisbane*, 63 M.J. at 115. By his third interview, he was well acquainted with CID processes and the military justice system. *See Bubonics*, 45 M.J. at 96 (whether an accused has "been involved with military justice before the night of his appre-

hension and interrogation" is a factor to take into account when analyzing the voluntariness of a statement). Furthermore, we note that neither INV Delgado nor SA Singh had elicited Appellant's ultimate confession—that he had vaginally penetrated ZC—at a prior interrogation. Thus, the cat was not yet out of the bag. Under these facts, we cannot conclude that the third interrogation was a continuation of the first. The military judge thus erred by failing to distinguish between the three interrogations.

Having found errors in the military judge's fact-finding and rationale, and having determined Appellant's confession to SA Boettger was voluntary under the totality of the circumstances, we conclude that the military judge abused his discretion in suppressing Appellant's third statement to law enforcement.

## V. Judgment

The judgment of the United States Army Court of Criminal Appeals is affirmed.

Judge RYAN, concurring.

I concur with the majority's opinion in full. I write separately only to express my skepticism that an accused may permissibly appeal an adverse ruling of a Court of Criminal Appeals (CCA) where the case came before the CCA as an interlocutory appeal by the government under Article 62, UCMJ, 10 U.S.C. § 862. I fully recognize that this Court has long considered petitions in this posture without question, even rarely granting and deciding cases in favor of the accused. *See, e.g., United States v. Mangahas*, 77 M.J. 220 (C.A.A.F. 2018). Nevertheless, this practice runs contrary to the well-established principles guiding criminal appeals.

It is a bedrock principle of appellate procedure that piecemeal appellate litigation should be avoided. *See Cobbledick v. United States*, 309 U.S. 323, 324–25 (1940). This policy against permitting interlocutory appeals is "especially compelling" in criminal cases. *Id*. at 325; *see DiBella v. United States*, 369 U.S. 121, 124 (1962) ("Th[e] insistence on finality and prohibition of piecemeal review discourage undue litigiousness and leaden-footed administration of justice, particularly damaging to the conduct of criminal cases."). We should therefore be hesitant to extend the purview of interlocutory appeals under Article 62, UCMJ, absent compelling justification.

Looking first to the text of Article 62, UCMJ, I see no hint that it provides any right to an accused. Indeed, the article's title states quite clearly what it provides: "Appeal by the United States." There is no mention of criminal defendants, nor, for that matter, is there any mention of this Court. Article 62, UCMJ. While the general question whether this Court may entertain an appeal of an Article 62, UCMJ, ruling by a CCA was answered in *United States v. Lopez de Victoria*, 66 M.J. 67, 68–71 (C.A.A.F. 2008); *see United States v. Michael*, 66 M.J. 78, 81–82 (C.A.A.F. 2008) (Ryan, J., with whom Erdmann, J., joined, concurring in part and in the result), we have never addressed head on the question whether we can or should utilize that logic to offer an avenue for

an accused to appeal an adverse Article 62, UCMJ, CCA ruling to this Court.[1]

The truncated nature of government appeals in criminal cases under Article 62, UCMJ, may justify our review of a CCA decision adverse to the Government. Unlike the accused, the Government's ability to appeal in criminal cases is historically disfavored and exists only by statute. *DiBella*, 369 U.S. at 130; *Carroll v. United States*, 354 U.S. 394, 400–01 (1957). Working from this baseline, Congress saw fit to enable certain government appeals in criminal cases in the military justice system. Article 62, UCMJ.

Article 62, UCMJ, entitled "Appeal by the United States," provides the government the right to appeal certain rulings and orders of a military judge. Article 62(a)(1), UCMJ. These appeals, by necessity, arise prior to any conviction and sentence and are interlocutory in nature because of limitations rightfully placed on government appeals of acquittals by the Double Jeopardy Clause—preventing an accused from being tried twice for the same offense. *See United States v. Wilson*, 420 U.S. 332, 339–51 (1975). In truth, an errant order at the trial level suppressing a key piece of evidence or dismissing a charge or indictment can equate to finality by preventing the government from prosecuting a case to a verdict. *See, e.g.*, *United States v. Watson*, 386 F.3d 304, 308 (1st Cir. 2004). And if the CCA upholds a decision against the government on appeal under Article 62, UCMJ, that decision would forever evade review at this Court unless the government may appeal again. In contrast, an accused faced with an unfavorable decision at the CCA is expressly permitted to appeal that decision in the ordinary course of appellate review if he is convicted. Article 66(b)(1)(B), UCMJ, 10 U.S.C. § 866(b)(1)(B). There is no reason Article 62, UCMJ, must or should be read to give an accused the opportunity to appeal.

---

[1] I recognize that Appellant asserts that his appeal is proper under Article 67(a)(3), UCMJ, 10 U.S.C. § 867(a)(3). However, Appellant is only in this position as a result of the Government's appeal under Article 62, UCMJ. It is not clear to me that this Court's jurisdiction under Article 67(a)(3), UCMJ, may be invoked in this context.

Further, I see no support for permitting an accused's interlocutory appeal based on the practice of Article III courts. Article 62, UCMJ, was modeled after 18 U.S.C. § 3731, *Lopez de Victoria*, 66 M.J. at 70, which permits government appeals in federal civilian criminal cases to the circuit courts of appeal.[2] 18 U.S.C. § 3731. When applying this statute or discussing criminal appeals generally, the Article III courts evince no understanding that statutes permitting interlocutory appeals by the government upset the long-standing presumption that criminal defendants may not appeal on an interlocutory basis. *See Flanagan v. United States*, 465 U.S. 259, 270 (1984) ("Nothing about a disqualification order distinguishes it from the run of pretrial judicial decisions that affect the rights of criminal defendants yet must await completion of trial-court proceedings for review."); *United States v. Hollywood Motor Car Co.,* 458 U.S. 263, 270 (1982) ("The right asserted by respondents is simply not one that must be upheld prior to trial if it is to be enjoyed at all."); *Cobbledick*, 309 U.S. at 325–26 ("The correctness of a trial court's rejection even of a constitutional claim made by the accused in the process of prosecution must await his conviction before its reconsideration by an appellate tribunal."); *United States v. Clariot*, 655 F.3d 550, 552 (6th Cir. 2011) ("Section 3731 provides a one-party path for interlocutory review of suppression orders. It allows the government, but not criminal defendants, to challenge a suppression ruling prior to trial."); *United States v. Williams*, 413 F.3d 347, 354 (3d Cir. 2005) ("Although an order granting suppression of evidence is not considered a final order, the United States is specifically permitted by 18 U.S.C. § 3731 to bring an interlocutory appeal. Section 3731 affords no such right to criminal defendants."); *United States v. Eggert*, 624 F.2d 973, 975–76 (10th Cir. 1980) ("[P]etitioner's contentions can be fully re-

---

[2] Prior to 1970, 18 U.S.C. § 3731 provided that government appeals from interlocutory decisions in criminal cases were heard directly by the Supreme Court. *See United States v. Marion*, 404 U.S. 307, 311 & n.2 (1971). In the Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, § 14(a), 84 Stat. 1880, 1890 (Jan. 2, 1971), Congress removed the Supreme Court's direct review and directed these appeals to the federal circuit courts. *Marion*, 304 U.S. at 311 & n.2.

viewed by this court on direct appeal in the event of a conviction. . . . [W]e do not believe that the due process violation alleged in this case . . . is the kind that justifies a departure from the general rule of non-appealability of prejudgment motions."). And in those cases where the government does appeal under 18 U.S.C. § 3731, there is no clear avenue to the Supreme Court for a defendant confronted with an adverse ruling. *See Wilson*, 420 U.S. at 353 (stating that a ruling in favor of an accused appealed by the government under 18 U.S.C. § 3731, "could be acted on by the Court of Appeals or indeed [the Supreme Court] without subjecting him to a second trial at the Government's behest" but that if the government prevails on appeal, "the case must go back to the District Court").

Article 62, UCMJ, like 18 U.S.C. § 3731, recognizes the government's limited ability to appeal and represents a legislative policy designed to carve out specific exceptions allowing the government to appeal decisions that would be otherwise unreviewable. The government may only appeal when a decision or order at the trial level falls under the strict requirements specified by Congress. *See Abney v. United States*, 431 U.S. 651, 656 (1977) ("The right of appeal . . . in criminal cases, is purely a creature of statute; in order to exercise that statutory right of appeal one must come within the terms of the applicable statute."); *United States v. Wuterich*, 67 M.J. 63, 72 (C.A.A.F. 2008) (stating that this Court does not liberally construe Article 62, UCMJ). Thus, we should be wary of permitting this same statute to be used by criminal defendants as an end run around the general prohibition on interlocutory appeals. *See DiBella* 369 U.S. at 124; *United States v. Hanks*, 24 F.3d 1235, 1239 (10th Cir. 1994) ("[Defendant] can not piggyback on the government's appeal. [Defendant's] appeal cannot stand on its own because the denial of a motion to suppress evidence is not immediately appealable."). Doing so would serve only to further delay and interrupt the proceedings below without adequate justification.

This case is a perfect example of needless delay and interruption. There is no colorable claim that Appellant was entitled to relief, as the CCA clearly explained. We nonetheless interrupted the trial—at which Appellant may still yet

be acquitted—for an additional period of time only to conclude that the CCA was precisely correct. In my view, we should only depart from the baseline principle disfavoring interlocutory appeals "when observance of it would practically defeat the right to any review at all." *Cobbledick*, 309 U.S. at 324–25. This is the purpose for the statutes authorizing government appeal under those circumstances. Article 62, UCMJ; 18 U.S.C. § 3731. In contrast, defendants may always seek appellate review if and when they are convicted, *see* Article 66(b)(1)(B), UCMJ, and there is no clear statutory authorization allowing criminal defendants to appeal on an interlocutory basis.

In this case, whether Appellant had the ability to appeal the CCA's decision and whether permitting this practice is workable was not raised or briefed, but I believe this Court should give this issue full consideration if and when it is presented in an appropriate case.